No. 29,855.

WILLIAM H. MADDY, RICHARD W. MADDY, FRANCIS M. MADDY, DELLA A. MOON, FLORENCE ELIZABETH HALL and SOLOMON MADDY, *Appellees,* v. NANCY ELLEN HOCK and MARY ETTA IVES, *Appellants.*

(4 P. 2d 408.)

Opinion filed November 7, 1931.

*F. E. Young, J. B. Riseley,* both of Stockton, and *H. McCaslin,* of Osborne, for the appellants.

*O. O. Osborn,* of Stockton, and *W. L. Sayers,* of Hill City, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: This was an action to set aside the last will of Lydia A. Maddy, an elderly widow who died in Stockton in December, 1929.

The testatrix and her husband, John Maddy, were residents of Rooks county for many years. They accumulated considerable money and property and reared a family of four sons and four daughters. Some ten years prior to his death John Maddy divided $32,000 in cash among his children—$4,000 to each. About that time he removed from his 240-acre farm to Stockton and resided there until his death in April, 1929. With him and his wife, during the last few years of his life, resided his youngest daughter, Nancy Ellen Hock, and her husband, Henry Hock. These two families shared the maintenance expenses of the household equally.

When John Maddy died in April, 1929, it was found that he had devised a life estate in all his property to Lydia, his wife, with remainder in equal shares to his eight children. Owing to the considerable division of cash he had made in his lifetime, Maddy's estate consisted chiefly of the Stockton home and the 240-acre farm. On his death his elderly widow, then approaching eighty and physically infirm, was confronted with the question whether she would accept the provision for her in her husband's will or claim her statutory half interest in his estate instead.

Apparently Lydia's children, or most of them, developed a keen interest in her determination of that question—the possible inference being that their views and advice, as far as they gave or had opportunity to give it, was colored by the ulterior effect of their mother's decision upon their own subsequent fortunes. If she should elect to accept the terms of the will the eight children would share equally in the remainder estate of their father. If she elected to claim her statutory half interest under the law there was a strong probability that when she in turn came to dispose of her property, Nancy Ellen, the youngest daughter, who with her husband resided with the mother, would get the lion's share.

That is precisely what came to pass. Whether persuaded or browbeaten into it by Nancy Ellen or not, the mother did elect to claim her statutory rights under the law. Apparently to head off that election and to forestall the making of a will in favor of Nancy Ellen, one of the sons instituted a proceeding in the probate court to have Lydia adjudged a feeble-minded person and incapable of managing her business affairs, and praying that a guardian be appointed for her estate. Notice of this proceeding was served on Lydia and the cause set for hearing on July 25, 1929, but owing to her illness at

that date no hearing was had; the cause was never docketed, nor even formally continued, but simply ignored thereafter.

It is probable, however, that Lydia took offense at the institution of this abortive proceeding, and that she got the idea that all six of these plaintiffs were inclined to look upon it with favor, or at least without disapproval, while Nancy Ellen and one sister, Mary Etta Ives, codefendant herein, opposed it.

On October 25, 1929, Lydia made her will, calling to her assistance a Stockton lawyer who served as her adviser and scrivener. By its terms the testatrix gave ten dollars each to her eight children, the Stockton home and its contents to Nancy Ellen, and the residue to Nancy Ellen and Mary Etta Ives jointly.

The testatrix died on December 24, 1929, and shortly thereafter this action was begun by Lydia's four sons and two of her daughters against their two sisters, Nancy Ellen and Mary Etta, charging that the testatrix lacked testamentary capacity, and that the will was made through the undue influence of the defendant Nancy Ellen Hock. Specific facts relating to the alleged undue influence were thus pleaded:

"Lydia A. Maddy resided in her home with Nancy Ellen Hock for several years prior to her death, which occurred at the age of eighty years. Testatrix was hard of hearing, dull of comprehension and depended for counsel in business matters on Nancy Ellen Hock, who lived with her, and testatrix would rely upon her advice; that Nancy Ellen Hock, a daughter of Lydia A. Maddy, attempted to prejudice her mother against appellees by statements made by Mrs. Hock to her mother to the effect that appellees desired to beat the testatrix out of her home and starve her to death and have her adjudged crazy, and that said Nancy Ellen Hock, by means of flattery, cajolery, threats and intimidations, placed said Lydia A. Maddy under her control.

. . . . . . . . . . . . . . . . . . .

"That the statements of Nancy Ellen Hock to her mother were untrue and made for the purpose of prejudicing testatrix against appellees and depriving appellees of a share of the estate of testatrix."

Defendants answered with general and specific denials and alleged that—

"Whatever ill feeling existed between Lydia A. Maddy and plaintiffs arose because of an insanity proceeding filed against Lydia A. Maddy prior to her death by plaintiffs in the probate court of Rooks county which greatly annoyed and distressed said Lydia A. Maddy; that plaintiffs, before the death of Lydia A. Maddy, made offer to her to dismiss said insanity or feeble-minded proceeding, if said Lydia A. Maddy would consent to the terms of the

will of her late husband, although it was the desire of Lydia A. Maddy to take under the law."

The cause was tried by the court with the aid of an advisory jury which rendered a special verdict as follows:

"1. Is the will of Lydia A. Maddy void because of unsound mind of said testatrix at the time said will was executed? A. No.

"2. Is the will of Lydia A. Maddy [void] because of fraud or undue influence of any of the defendants upon the mind of the testatrix? A. Yes."

The trial court approved these findings, set aside the will and entered judgment in favor of plaintiffs.

Defendants appeal, complaining particularly of the want of evidence to support the verdict and judgment, and criticizing the observations of the trial court which, according to the view of appellants' counsel, reveal an inaccurate appreciation of its own responsibility to decide disputed issues of fact, and show that the court surrendered its own independent judgment to that of the jury. The trial court said:

"In a case of this character the court is not bound by the findings of the jury, but where questions of fact are submitted to a jury of twelve, they are submitted on the theory that twelve men may have better judgment than one. . . .

". . . The court would have very willingly entered judgment . . . finding in favor of the defendants in this case if the jury had so found on the other questions [want of testamentary capacity], but there are twelve votes against one in this case, and there is evidence, competent evidence, sufficient, the court believes, to uphold the verdict of the jury."

This court is constrained to hold that such views of a trial court's responsibility in an equity case are unsound. It is of very little consequence what the verdict of an advisory jury may be. The full responsibility rests on the court itself, as has often been decided. While the court may adopt the findings of an advisory jury it ought not to yield its own independent judgment to them. The opinion of the trial judge, trained as he is to weigh the probative force of evidence and the credence to be attached to the testimony of litigants and their partisans, may well outweigh the conclusions of a jury of laymen whose experience in such respects is necessarily casual.

In *Bell v. Skinner*, 119 Kan. 286, 239 Pac. 965, which was an action to set aside a will, this court said:

"They [counsel] seem to overlook the fact that this was a case of an equitable character, where, if a jury is called at all, it serves only in an advisory ca-

pacity, and the court is not bound to defer to its judgment, and, indeed, in such cases the trial court cannot shift its own peculiar responsibility for the discovery of the truth of disputed facts by merely calling an advisory jury to its assistance. (Citations.)" (p. 290.)

In *Bortnick v. Cudahy Packing Co.*, 119 Kan. 864, 866, 241 Pac. 442, which was a workman's compensation case, it was said:

"In this case, the jury's findings did not amount to a picayune until they were adopted and approved by the trial court as its own. (Citations.)"

Indeed, the court's remark concerning the judgment of *twelve being better than one* misstates the scope of the trial court's responsibility in dealing with the verdict in an ordinary civil or criminal action at law. (*Butler v. Milner*, 101 Kan. 264, 166 Pac. 478; *State v. Frey*, 111 Kan. 798, 208 Pac. 574.)

In *Stroup v. Northeast Oklahoma Rld. Co.*, 122 Kan. 587, 253 Pac. 242, which was an action for damages for personal injuries, Mr. Justice Mason, speaking for this court, said:

"As suggested, this court has in a number of instances referred to the trial judge as a thirteenth juror. . . . This language is attributed to Dean Wigmore: 'To save justice from the consequences of using untrained jurors, there must be judicial control. The judge must be the thirteenth juror. If this feature is gone, jury trial becomes, as at Athens [when Socrates was tried], merely a system of mob justice.' . . .

"Whatever difference of opinion there may be concerning the proper terms in which to describe the duty of the trial judge in his capacity as what is sometimes called the thirteenth juror, this much is clear—if he is to let the verdict stand he must approve it upon his own judgment and not upon that of the jurors. This does not mean that the decision of the jury is not to weigh with him in making up his mind, but the final decision must be his and not merely the acceptance of theirs." (pp. 592, 593.)

Passing next to appellant's main contention—that the finding of undue influence was not supported by substantial evidence, this court has read the record repeatedly and with painstaking care. There is considerable testimony (which the advisory jury apparently believed) tending to show that Nancy Ellen Hock exerted strong influence—perhaps undue—upon her mother to induce her to renounce the provision made for her in her husband's will and to claim her statutory half interest in his estate under the law. A witness testified that he had heard Nancy Ellen say, "By God, she [Lydia] has got to do as I say." At another time when the mother indicated a willingness to accept the provisions of her husband's will, Nancy Ellen "jumped up out of her chair and said, 'By God, you are not going to sign that will.'" These incidents, however, and others of

similar import contained in the record, while quite probative on the question whether undue influence was exerted on the aged mother to induce her to reject the provision for her in her husband's will, are of very little significance on the question of present concern— whether undue influence was exerted on Lydia when she came to make her own will.

It is the law that to overthrow a will on the ground of undue influence it must be shown that such improper influence acted upon the testatrix at the time the will was made, and to such an extent that it quite overruled and dominated the normal independent will, discretion and judgment of the maker of the will, and substituted therefor the will of the person exerting such undue influence.

"To destroy the validity of a will undue influence must amount to coercion, compulsion or constraint which destroys the testator's free agency and by overcoming his power of resistance obliges him to adopt the will of another instead of exercising his own. It must be brought to bear directly upon the testamentary act, and particular parties must be benefited or disfavored as the result of the purpose and pressure of the dominating mind." (*Ginter v. Ginter,* 79 Kan. 721, syl. ¶ 1, 101 Pac. 634.)

In the opinion of the case just cited it was said:

"To be classed as 'undue,' influence must place the testator in the attitude of saying: 'It is not my will but I must do it.' He must act under such coercion, compulsion or constraint that his own free agency is destroyed. The will or the provision assailed does not truly proceed from him. He becomes the tutored instrument of a dominating mind, which dictates to him what he shall do, compels him to adopt its will instead of exercising his own, and by overcoming his power of resistance impels him to do what he would not have done had he been free from its control." (p. 725.)

Tested by the rule just quoted, the record is altogether barren of evidence to show that Nancy Ellen Hock exercised any coercive influence, compulsion or constraint which destroyed her mother's free agency in the making of this will. No evidence was adduced showing that any influence of Nancy Ellen Hock, undue or not undue, was brought to bear directly upon the testamentary act. All the evidence on this point was supplied by defendants. It was to the effect that the testatrix told Nancy Ellen Hock to invite a lawyer to come to the house; Nancy did not do so; and he was then called by a sister of the testatrix. This lawyer, an attorney of Stockton, gave testimony at length which tended to show that he and the testatrix had repeatedly discussed the matter of her making a will. His professional relationship to her apparently began when the old

lady was confronted with the problem of accepting the provision made for her in her husband's will or claiming her rights under the law. Later she repeatedly discussed with him the probate court proceeding begun to have her declared incompetent to manage her affairs. Still later, on October 25, 1929, he was called to the Maddy home by Sarah Maddy, sister of the testatrix. His testimony, in part, reads:

"Mrs. Maddy, her two sisters and Ella Hock were there. Mrs. Lydia A. Maddy said: 'Can I make a will, if the insanity proceeding will not prevent my making one?' I told her she could. I said: 'What do you want done with your property.' She said: 'I want Ella paid for taking care of me, and I want to give Mrs. Ives something. I want to give Ella the house.' . . . She said: 'Do I have to give something to all of the children?' I said: 'It is customary but not required. I have always provided for $10 at least.' Then Mrs. Maddy gave me the names of her eight children. She said: 'I want Ella to take care of me while I live and be paid for it at the rate of $50 a month.' She wanted the residue to go share and share alike to Ella and Mrs. Ives, and Ella Hock to be executrix. She said she wished I could fix it up right away. I drew the will and returned, read the will to Mrs. Maddy, and she said it was what she wanted. She told me those who would be all right for witnesses. I got Mr. Hulse and Mr. Marshall, who lived near by. Then I read the will a paragraph at a time and each time asked her if it was as she wanted and she said it was. Mrs. Maddy said: 'I don't believe I can sign it; I am too unsteady.' She made her mark. Then the will was witnessed. Later she called me to the home, asked me to take the will, put it in my safe and keep it for her, which I did."

Now the trial court and advisory jury were not bound to believe the testimony just quoted, nor any other evidence adduced by defendants to disprove the charge of undue influence; but it is the only sort of evidence contained in the record which bears upon the crucial question involved in this lawsuit. (*Crow v. Simon*, 132 Kan. 519, 296 Pac. 718.) Disbelief in such testimony does not warrant the indulgence of inferences to the contrary. Moreover, the fact that Nancy Ellen Hock may have exercised undue influence on her mother to coerce her into rejecting the terms of her husband's will does not justify an inference that the mother was subjected to similar domination and constraint some months later when she came to make her own will. It is settled law that mere suspicion, conjecture, possibility or guess that undue influence induced the making of a will is not sufficient to base a finding and judgment to that effect. (*Rishel v. McPherson County*, 122 Kan. 741, 749, 253 Pac. 586.) Neither will a showing of opportunity and motive to exercise

undue influence warrant an inference that it has been exercised. (*Nordman v. Nordmark*, 100 Kan. 522, 524, 164 Pac. 1062.)

Counsel for appellees direct our attention to the fact that Nancy Ellen Hock was in the court room at the trial, "and gave no testimony in explanation of, or denial of the facts proven against her." They invoke the rule that the omission of a party to testify concerning a fact within his peculiar knowledge raises a presumption that his testimony if produced would be unfavorable to him. If testimony had been adduced tending to show that Nancy Ellen had coerced her mother into making this will, there would be some room for the application of the rule invoked. Here, however, as we read the record, there was nothing for her to deny or explain. Indeed, it is *aliunde* the record that we are informed that Nancy Ellen Hock was in attendance at the trial.

In view of what has been said above, it is clear that the judgment cannot stand. It is therefore reversed and the cause remanded with instructions to enter judgment for defendants.