No. 39,838

In the Matter of the Estate of Effie C. Whitmore, Deceased. (AMELIA E. SHOPE, et al., Proponents, *Appellees*, v. NELLIE F. REES, et al., Opponents, *Appellants*.)

(290 P. 2d 105)

Opinion filed November 12, 1955.

*Donald D. Williams,* of Wamego, and *Glee S. Smith,* of Larned, argued the cause, and *Maurice A. Wildgen,* of Larned, was with them on the briefs for the appellants.

*Arthur S. Humphrey,* attorney for Adult Appellees and Guardian Ad Litem for Minor Appellees, of Junction City, argued the cause, and *Morgan Wright,* Guardian Ad Litem for Minor Appellees, of Larned, and *James V. Humphrey,* attorney for Adult Appellees, of Junction City, were with him on the briefs for the appellees.

The opinion of the court was delivered by

HARVEY, C. J.: This was a proceeding to probate the will of Effie C. Whitmore, deceased. The appeal is from an order of the district court directing the probate judge to admit the will to probate. The opponents have appealed. Broadly speaking, two questions are raised: First, that the proponents' showing of the execution of the will was not sufficient to comply with our statutes, and, second, that the testatrix was mentally incompetent to make a will. The will, with its attestation clause, reads:

"I, Effie C. Whitmore, of White City, Morris County, Kansas, being of lawful age, of sound and disposing mind and memory, and not under any restraint, do hereby make, publish and declare this to be my last will and testament, hereby revoking any and all former wills by me made.

"First: I direct that all my just debts, including funeral expenses, be paid by my executor.

"Second: I give, bequeath and devise to my sister, Mamie F. Shope, one dollar ($1.00).

"Third: I give, bequeath and devise to Amelia E. Shope, the quarter section of land in Pleasant Ridge township, Pawnee County, Kansas, left to me by my father in fee simple, an approximate description being the Northeast Quarter (NE 1/4) of Section Three (3), Township Twenty-two (22), Range Eighteen (18); and I also give to Amelia E. Shope Three Thousand Dollars ($3,000) of my government bonds.

"Fourth: All the residue and remainder of my estate, real, personal, or mixed, I give, bequeath and devise in two equal portions—fifty per cent of said remainder to go to M. T. Shope and Violet Shope, his wife, Nellie F. Rees and Harry Rees, her husband, and Vernon E. Shope and Amelia E. Shope, his wife; in equal shares and fifty per cent of said remainder to go to Frank T. Shope, Irving M. Shope, Lena F. Shope, Louise R. Shope, John W. Shope, George Rees, Roy Rees, Glenn Rees, James I. Shope, Mildred A. Shope, George E. Shope, Glenda J. Shope, and Vernon Gene Shope, in equal shares.

"Fifth: I hereby appoint R. H. McKimmey, White City, Kansas, executor of this will.

"Witness My Hand at Council Grove, Morris County, Kansas, this 13th day of January, 1950.

/s/ Effie C. Whitmore

"Signed and acknowledged by the said Effie C. Whitmore, testatrix, as and for her last will and testament, in our presence, and we, at her request, in her sight and presence, and in the presence of each other, have subscribed our names as attesting witnesses, at Council Grove, Morris County, this 13th day of January, 1950.

| | |
|---|---|
| /s/ H. P. DeHoff | Council Grove, Kansas |
| /s/ Constance L. Brown | Council Grove, Kansas" |

To establish the due execution of the will the proponents called Constance L. Brown, who testified she was an attorney engaged in general practice with her husband in Council Grove, and at that time was county attorney of Morris County; that she was not acquainted with Effie C. Whitmore prior to January 13, 1950, when she came to her office in the late morning accompanied by Amelia Shope and Ray McKimmey; that Miss Whitmore used a cane and was rather weak physically; that she said she was approximately 76 years old; that she (Mrs. Brown) took her into her private office and talked with her alone; and, that Mrs. Shope and Mr. McKimmey stayed in the reception room. Mrs. Brown further testified:

"After she came into my office, she wanted to know whether she could make out a will since there had been a petition filed to test her competency. (The record discloses this petition had been filed by her sister, Mamie F. Shope, on January 10, 1950.) I then went ahead with the questioning of her, and at two or three times during the process I know I called my husband and talked to him over the phone. I knew that because of the fact that she had a petition filed against her I would want to be more careful than ever in making out a will, and before I made one out I wanted to talk to her and see if, in my opinion, she knew what she was doing.

"I asked her if she knew what her property consisted of, she gave me the section, township and range numbers from her memory as it appears in the will, and I asked her if she knew who she wanted to give her property to and the relatives she had. She produced a memorandum identified now as proponents' Exhibit No. 1, which has been in our files in our office. (The record discloses that this memorandum consisted of the names of her nephews and nieces and the spouses of those who were married, and also included the names of her grandnephews and nieces whose names appear in the will, which memorandum was dictated by her to one of her grandnieces who typed the list of names the evening before when she was talking of going to a lawyer.) At that time she described how much she wanted to go to the first few names and the last few names on the list. The list was made up of the first names, being her nieces and nephews and the ones they married, and the last names being the children of such nieces and nephews, all being children and grandchildren of Mamie Shope, her sister.

"When Miss Whitmore told me what she wanted done with her property, she told me that she did not care to leave anything to her sister Mamie, that they had never gotten along too well from time of childhood, that she was now living with Amelia and wanted to see Amelia was taken care of. The will, now identified as proponents' Exhibit No. 2, was typed by me."

## On redirect examination Mrs. Brown testified:

"Before starting to transcribe the will, I formed an opinion in my own mind that I was sure she (Effie C. Whitmore) was mentally competent to make a will before I made it, and this opinion continued through the time she was there."

## Mrs. Brown further testified on direct examination:

"After I transcribed the document I went over it carefully with Miss Whitmore to be sure it was what she wanted, and this was in the presence of the other subscribing witness. I read it to her paragraph by paragraph while she looked at it, and I asked her if that was what she wanted. I don't recall that she made any comment except that that was what she wanted at the time I read it. I saw Effie C. Whitmore sign her name at the foot of the document now identified as proponents' Exhibit No. 2, and she signed it in the presence of W. H. DeHoff, the other subscribing witness, and myself. Mr. DeHoff, the other witness, died shortly thereafter. Miss Whitmore, Mr. DeHoff and myself were all present together at the signing of the will, and each of us signed in the presence of the other two. After the will was signed, Miss Whitmore paid me by check. . . ."

On cross examination she testified:

"While Effie and I were discussing the will, Amelia Shope and Mr. Mc-Kimmey were in a different room. They were not present when the will was signed.

"After the original copy of the will was signed and placed in our safe, it remained there until Mr. Humphrey wrote us that Effie had died, and we sent it to him at that time. At the time the will was drawn on January 13, 1950, Effie seemed to be fairly bitter towards her sister Mamie. Amelia Shope and Mr. McKimmey were in different parts of the office while I talked with Miss Whitmore. I asked Effie questions about her property, and she answered right up on most of the questions. I asked such questions as: 'What would you like to do with this land?' and 'What land do you have and what would you like to do with the land?' Miss Whitmore was in my office that morning for somewhere around an hour. She mentioned that one of her brothers had just died in a hospital—the State Hospital in Larned, and she was upset at the idea that he had died."

At the conclusion of Mrs. Brown's testimony counsel for the proponents rested, stating, "believing that they have shown the prima facie case." Counsel for the opponents demurred to the evidence on the ground that the evidence was not sufficient to establish a prima facie case, relying upon G. S. 1949, 59-2224, the pertinent portion of which reads:

"On the hearing of a petition for the probate of a will at least two of the subscribing witnesses shall be examined if they are within the state and competent and able to testify. Otherwise the court may admit the testimony of other witnesses to prove the capacity of the testator and the due execution of the will; and as evidence of such execution may admit proof of the handwriting of the testator and of the subscribing witnesses."

The court overruled the demurrer. We think the ruling was correct. It will be observed that the statute requires two witnesses to the testator's signature but it does not require (as counsel for opponents argue) two witnesses to the signature of a deceased witness to the will. Certainly the court should take such testimony as convinces it of the genuineness of the signature of the deceased witness. Mrs. Brown was a competent witness on that point—apparently it satisfied the court.

Opponents next argue that Effie C. Whitmore lacked testamentary capacity to make a will, and that she was unduly influenced in making the will in question. The trial court held the burden of proof concerning those matters was upon the opponents who had raised them by the pleadings. This branch of the case was largely a question of fact. It is the function of the trial court to pass upon the credibility of witnesses and the weight to be given

to their testimony, and to determine what the facts proved. Ordinarily, the trial court's ruling upon matters of that kind will not be disturbed where there is competent evidence to support it. See, *Wilson v. Holm*, 164 Kan. 229, 188 P. 2d 899, and many other cases cited in Hatcher's Digest (Rev. Ed.), Vol. 1, Appeal & Error, § 507.

We examine briefly the testimony which sustained the court's ruling. The testimony of Mrs. Constance Brown has already been set out. We summarize, or quote, excerpts from witnesses called by the proponents.

R. H. McKimmey, who lived in Morris County, testified that on January 13, 1950, he went with Amelia Shope and Effie C. Whitmore to Council Grove; that they first went to Dwight, Kansas, to the house of George E. Brethour, an M. D., who took Miss Whitmore into his private office; that after leaving Dwight they went to the office of Brown and Brown, attorneys in Council Grove, reaching there about 11:00 o'clock; that the office had kind of an "L" shaped annex on it; that Effie Whitmore and Mrs. Brown occupied the large office where the typewriter was; and, that he and Amelia were in the little "L" shaped corridor.

George E. Brethour testified he is a doctor of medicine; that he lives at Dwight, Kansas, in Morris County; that he was graduated from medical college in 1909, and had practiced continuously in Dwight since that time; that he became acquainted with Effie C. Whitmore when her sister brought her to his house on two or three occasions; that Miss Whitmore was what you would say somewhat peculiar and perhaps a little slow in her thinking but nothing outside of that seemed unusual about her mentality. He said, "I didn't notice any derangement." He testified that Mrs. Vernon Shope and Mr. McKimmey brought Miss Whitmore to his office and asked him if he would look her over and visit with her and state whether he thought she was capable of making a will; that he took her in his office and visited with her alone quite awhile and asked her the day of the week and the month, which she answered correctly, and tried to find out from talking with her whether she knew what she wanted to do or whether she didn't know what she wanted to do. He stated, "because usually if they can tell you those two things, they kind of know what they are wanting to do."

There were other parts of that conversation. There were questions that one would ask to try to get an honest opinion of whether he thought Miss Whitmore knew what she wanted to do. Doctor

Brethour stated he had formed a professional opinion as to her mental condition at that time. He said:

"My opinion was that she knew what she wanted to do; that was my opinion."

He further stated:

"I think she had mental capacity to know who her relatives were on January 13, 1950, and I think she had mental capacity to form a correct appraisal of what the different relatives and others might deserve from her at that time. The whole purpose of my examination, on January 13, 1950, was to determine whether or not she was capable of making a will."

James Bowers, an osteopathic physician, testified that he lived in Council Grove and practiced in White City; that he had practiced in Morris County since June, 1937; that during his studies he had courses in mental diseases; that he was licensed to practice Osteopathy in Kansas; that in his practice he had treated patients who had abnormal mental manifestations; that from his education and practical experience, he was able to form an opinion as to the mental capacity of persons whom he came in contact with professionally; and, that he became acquainted with Effie C. Whitmore and first attended her professionally on April 8, 1947, when she was brought to him by her sister, Mrs. Mamie Shope, for whose family he had been a physician prior to that time. He further testified:

"On January 13, 1950, I saw her around one o'clock when they, Mr. Mc-Kimmey, his wife, and Amelia, brought her to my residence. They informed me that she had made her will that morning, and they wanted me to talk with her and to see if I would examine and talk with her so I could sign, or if need be, testify as to her mental capacity and mental condition on that day. I had heard that an incompetency proceeding had been filed a few days before. I talked with Miss Whitmore at that time while she was seated in the car in front of my house. She seemed to understand what I said. I understood what she said. From my conversation with her, I formed an opinion as to her mental capacity, and it is my opinion that she was competent on that day."

The witness testified to having treated Miss Whitmore before that date, and later.

Mrs. John Eshelman testified that she lived at White City just across the road from the home formerly occupied by Vernon and Amelia Shope with whom Effie C. Whitmore lived for a little more than a year; that she became acquainted with Effie C. Whitmore and saw her every few days. She said,

"During the time I knew her I talked to her and she talked to me. We just visited. There was not any time when Miss Whitmore's conversation did

not seem to be wholly sane. What she said made sense to me and she seemed to understand what I said. Whenever I saw her she always recognized me and would visit. There was nothing at any time which struck me as being different from the normal in her mentality. She mentioned the names of her relatives in conversation and expressed affection for some."

She testified upon cross-examination:

"Irregardless of what doctors at the Larned State Hospital thought, I still wouldn't believe that Effie Whitmore was incompetent."

H. L. Reed testified that he lived in Larned and was president of the First State Bank; that he had known Effie Whitmore for about 25 years; that she did business at his bank; that she had a small checking account, and would buy and sell government bonds; that she had a safety deposit box; that while she lived in Larned she transacted her own business at the bank; that she came in about once a year after she moved to Morris County; that on some date early in 1950, "she was in our bank, and she signed a release on the renting of the safety deposit box at that time." That the bank had remodeled and moved in the six months before that time, and she thought she was in the wrong place until she saw him, when she said, "No, this is the right place." That she recognized him and they visited and she wanted to know her balance and what the box payment was; that she said she was physically not well and wanted the account checked out and to take the contents of the box before she moved away, which they proceeded to do; that there was a balance of two or three hundred dollars in the checking account, and she said she would draw that out later. He was asked, "Now, in your talk with her, and in the course of the transaction, did you form an opinion in your own minds as to her competency to transact that business? That would be, yes, or, no? A. Yes. Q. What was that opinion? A. She was always the same for the twenty-five years I knew her. . . ."

Stanley N. Moffett, of Larned, vice president of the First National Bank, testified he first became acquainted with Effie C. Whitmore when she was a customer of that bank 18 or 19 years ago; that she carried a checking account and had a safety deposit box there; that she signed the access register on February 1, 1950, and asked for the balance of her checking account. He further testified, "I have no reason to believe she didn't know where she was, because she asked for her box. I do not have much of an opinion as to whether

or not she was competent to transact the business for which she had come to the bank."

The testatrix died on January 1, 1953. The inventory and appraisement of her estate listed property of a total value of $76,119.15.

At the close of the evidence the court asked counsel whether or not they desired the court to make findings of fact and conclusions of law. The attorneys for each side announced they were not requesting the court to make findings of fact and conclusions of law. The court did state, "The burden was on the opponents of the will to prove either lack of testamentary capacity to make a will, or undue influence in making the will. The opponents failed to establish this burden of proof. *Maddy v. Hock,* 134 Kan. 15, 4 P. 2d 408; *In re Estate of Walker,* 160 Kan. 461, 163 P. 2d 359; *In re Estate of Smith,* 168 Kan. 210, 212 P. 2d 322."

It was adjudged, ordered and decreed by the court that the document proposed by proponents as the last will of Effie C. Whitmore, should be admitted to probate in the probate court of Pawnee County, Kansas, and the proceedings were remanded to the probate court for further proceedings in accordance with the decision.

There is ample evidence to support the judgment of the trial court. We find no error in the record. The judgment of the trial court is affirmed.