No. 35,693

E. W. JERNBERG, Administrator of the Estate of Erick V. Olson, Deceased, *Appellant,* v. EVANGELICAL LUTHERAN BETHANY HOME FOR THE AGED, *Appellee.*

(131 P. 2d 691)

Samuel E. Bartlett and George Siefkin, both of Wichita, argued the cause, and Evart Mills, of McPherson, Robert C. Foulston and Lester L. Morris, all of Wichita, were on the briefs for the appellant.

James A. Cassler and George R. Lehmberg, both of McPherson, argued the cause, and J. Rodney Rhoades, L. H. Ruppenthal and Paul A. Lackie, all of McPherson, were on the briefs for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This action was brought July 30, 1941, by the administrator of the estate of Erick V. Olson, deceased, for the benefit of the estate and the heirs at law of decedent. The defendant is a Christian charitable institution which for many years has been and is conducting a home for aged people at Lindsborg, and hereafter will be spoken of as the Home. The action was to rescind and to set aside a written contract between the Home and Olson, executed July 18, 1936, and a deed, in which the grantor reserved a life estate, of the same date and recorded December 7, 1936, executed by Olson to the Home for 240 acres of land in McPherson county, upon the alleged grounds of Olson's mental incapacity, of defendant's misrepresentation and undue influence, of inadequate consideration, and breach of contract. After an extended hearing the trial court made findings of fact and conclusions of law and rendered judgment for defendant. Plaintiff has appealed.

Since there is no cross-appeal we pass by the question of the statutes of limitation and some other questions raised by defendant by its demurrer to the petition and by other pleadings filed.

Though the principal point argued on behalf of appellant is predicated on facts found by the court, a brief statement may be helpful. Erick V. Olson was born in Sweden, March 22, 1862. In July, 1869, he came to McPherson county with his parents, who settled on a farm. He was related by marriage to Dr. Olaf Olson, a minister, who founded the town of Lindsborg. Erick V. Olson never married. At the time of the execution of the instruments sought to be set aside in this action he was the owner, through inheritance, of approximately four-fifths interest in the 240 acres of land conveyed and had $4,000 of certificates of deposit in the Farmers State Bank at Lindsborg. His only heirs at law were the three persons named in the petition as nieces and another named in the answer as a nephew, one of whom lived in Sweden, the other three at Rock

Island, Ill. He appears to have had nothing in common with these relatives. He never wrote to them, although those in Illinois sometimes wrote to him. He spoke of them as "relatives but far away." He lived upon and operated the farm above mentioned. For many years he had transacted his banking business with the Farmers State Bank of Lindsborg, dealing particularly with Elmer E. Peterson, its cashier, who among other things had prepared his papers and otherwise assisted him in the administration of the estate of his father, who died in 1915.

On July 8, 1935, Olson suffered a sunstroke and was taken to the St. John's Hospital at Salina, where he remained four days and was discharged as recovered. On July 12, 1935, upon the advice of Mr. Peterson and other friends, he entered the defendant Home under a contract to pay $25 per month for his care and maintenance. Soon thereafter he had a sale of his personal property at the farm, leased the farm to a Mr. Maupin, made some improvements about the house, and built a silo. For some time he had been partially crippled with arthritis and rheumatism.

Mr. Olson lived at the Home more than five years, until his death July 31, 1940. He appears always to have been well satisfied and to have appreciated the treatment and care given him and other inmates of the Home by those in charge of it. During all that time he transacted his own business with the aid of Mr. Peterson. For perhaps the first two years he went to the bank or to other places in town where he had business or desired to visit. When he did not feel like going to the bank, or later when he was not able to go, he sent word to Mr. Peterson to come to the Home to transact such business as he desired to have done. Mr. Maupin went to the Home to discuss business matters with him three or four times a year.

Perhaps early in July, 1936, in talking with Doctor Bergin, president of the Home, Olson expressed appreciation of the treatment he had received and the work the Home was doing and said he thought he wanted to do something for it. Previously he had expressed similar views to the matron and to one or more of the nurses. Doctor Bergin told Olson if he cared to do that he should get himself a lawyer. In some way not clearly disclosed by the record word got to Mr. Nyquist that Olson desired to see him. Mr. Nyquist had been in the practice of law at McPherson for many years and at that time was county attorney. It appears he had previously transacted some minor items of business both for the Home and for Mr. Olson.

Mr. Nyquist went to the Home and had a talk with Mr. Olson in his room. Apparently no one else was present. He then went to his office and drew the contract and deed involved in this action. By it the Home agreed that Olson was admitted as an inmate at the Home—

". . . . and he shall there receive board, care, clothing, medical attention, nursing and shall have a room at the said home for his use with all furniture, bedding and other requirements; all during his natural life, and the said party of the first part shall pay all expenses necessary for his care while in good health or while sick, and when he passes away shall pay all funeral expenses consistent with his station in life without stint or forbearance.

"For and in consideration of the foregoing covenants and promises the party of the second part, taking into consideration the function in society of the said Bethany Home, its contribution to the welfare of the aged and infirm, he, the said Erick V. Olson, without persuasions or inducements beyond those set out in detail above, does hereby pay to and does hereby deliver to the said Evangelical Lutheran Bethany Home for the Aged, of Lindsborg, Kansas, the sum of four thousand dollars, but reserves interest at the rate of 4% per annum during his lifetime, which the said party of the first part agrees to pay to him semiannually. The said party of the second part for and in consideration above set out has by separate deed conveyed certain real estate to the said party of the first part. Said real estate is described as follows: (Property is here described.)

"For the true and faithful performance of all the promises and agreements heretofore made by the said first party, The Evangelical Lutheran Bethany Home for the Aged, party of the first part, binds itself, its successors, officers, and assigns for the full and complete performance of each and every one of the covenants and agreements herein made by the said party of the first part." . . .

The deed drawn at the same time conformed to the contract except that it reserved to the grantor the use or income from the property for his lifetime. Mr. Nyquist sent these instruments to the Home, where they were executed on July 18, 1936. Mr. Peterson was there at the time of the execution and took the acknowledgments of Olson. At the same time the certificates of deposit, amounting to $4,000, were assigned by Olson to the Home, and at that time the $25 per month previously charged for the care of Olson at the Home ceased. The Home paid the interest on the $4,000 to Olson as long as he lived, except a partial payment due at his death was paid to his administrator. Mr. Olson also received the income from the farm as long as he lived and continued to transact his business with Mr. Peterson, Mr. Maupin and others. He was well cared for during his stay at the Home, and at his death the Home paid his funeral expenses. No complaint is made of any

of these things except items mentioned in findings Nos. 10 and 11.

In May, 1937, Mr. Olson had an epileptic convulsion which seriously weakened him at the time, but from which he recovered in a few days. Later he had more of these. His arthritis increased in severity until his knees were stiff and he had to get about in a wheel chair. He had other ailments incident to old age. He had an agreeable disposition, but very definite ideas, and was not easily persuaded against his will. He read the newspapers a great deal and some books and discussed politics, news items and other matters of interest. Much of the evidence pertained to his mental condition in 1938 and later. The principal findings of fact argued on the appeal may be quoted as follows:

"1. That Erick V. Olson, at the time of making the contract and deed here involved, on July 18, 1936, had the mental capacity to enter into such transaction even though he was a semi-invalid and his mental powers had deteriorated due to his generalized arteriosclerotic condition, further complicated by the prolonged severe heat wave.

"2. That at the time of signing such instruments and other papers in connection therewith, Olson knew and understood their purport and their effect upon his property and his future financial condition resulting therefrom.

"3. That the defendant, The Bethany Home, its agents and employees occupied a confidential relationship toward the said Erick V. Olson at the time of the execution and delivery of such instruments.

"4. That the execution and delivery of such instruments came about as the result of a desire upon the part of the said Erick V. Olson primarily to secure for himself a home, care, and companionship for the duration of his life and to provide for the proper care and disposition of his remains after his death, and secondarily to make a gift to the defendant home.

"5. That the decision to make such a contract and disposition of his property was voluntary upon the part of the said Erick V. Olson, although Doctor Bergin, Olson's pastor and president of the board of the defendant home, solicited his consideration of some kind of a gift to the home.

"6. That there was no undue influence upon the part of the defendant home, its agents or employees, or any other person which caused or produced the execution and delivery of such instruments.

"7. That G. Nyquist, an attorney, of McPherson, Kansas, drafted the instruments in question for both Olson and the defendant home, but did not represent either one in particular. Nyquist died in the fall of 1936.

"8. That Olson did not have independent advice from any source prior or subsequent to executing and delivering the instruments in question; however, as found above, no undue influence was exerted on the said Olson and under all of the circumstances of this case the court feels that such advice is not a prerequisite of sustaining such instruments.

"9. That there was no overreaching of or unfairness toward Erick V. Olson in the terms and conditions of said contract; the defendant home, at all times, stood ready, willing, and able to supply all of Olson's reasonable wants

and needs pursuant to the terms of said contract and did perform its part of the contract without cost to Olson except that Olson voluntarily paid his own doctor bills and certain other items.

"10. That Erick V. Olson by February, 1938, became and thereafter was mentally incompetent; that the following items voluntarily paid for by Olson subsequent to the time that he became incompetent, were necessities, to wit: (Certain items are listed, amounting to $113.32.)

"11. That Erick V. Olson employed and paid for the services of a special nurse, Lillian Heglund, from May 24, 1937, to August 1, 1938; such special nurse was not at any time a necessity although it is true that Olson's physical condition required special care; after August 1, 1938, the defendant home supplied such attention through one of its regular employees who tended the wants of other residents in the home in addition to properly caring for Olson; and that the defendant home could and would have provided the necessary special attention for Olson had it not been for the fact that Olson retained the special nurse for the above-mentioned period at his own expense."

The court also made the following finding:

"Pursuant to supreme court rule No. 52, and at the request of counsel for the plaintiff, the undersigned judge hereby certifies that in deciding the above case he did apply the presumption of law with respect to parties occupying fiduciary relationship and did require the defendant to sustain the burden of proof on the issue of undue influence."

Conclusions of law were made and judgment rendered in harmony with the findings.

Plaintiff filed a motion for a new trial and other post-trial motions, all of which were considered by the court and overruled, and judgment was rendered for defendant upon the issues of the validity of the contract and deed but in favor of plaintiff for $113.32, found by the court to have been expended by Olson for necessities after February, 1938.

In this court counsel for appellant argue that under the circumstances disclosed by the record independent advice was necessary to sustain the transfer of the property, citing G. S. 1941 Supp. 59-605; *Smith v. McHenry,* 111 Kan. 659, 663, 207 Pac. 1108; *Flintjer v. Rehm,* 120 Kan. 13, 17, 241 Pac. 1087; *Barger v. French,* 122 Kan. 607, 612, 253 Pac. 230; *Madden v. Glathart,* 125 Kan. 466, 473, 475, 265 Pac. 42; *Overstreet v. Beadles,* 151 Kan. 842, 847, 101 P. 2d 874, and cases collected in the annotation, 123 A. L. R. 1482, 1497.

It is argued that a confidential relation between Olson and defendant having been found by the court, a presumption of law arose that the transaction was unfair and the result of undue influence, hence that the burden of proof was upon defendant to show by clear, satisfactory proof that the defendant was acting in good faith, that

the transaction was fair to Olson, that the instruments were not executed by him as the result of trust and confidence in the defendant, and that he clearly understood and comprehended the terms of the instruments and realized their effect upon his property and finances.

The principles of law set out and applied in the cases relied upon by appellant are quite well established in this state, and we have no desire to detract from them. The real question is whether they are applicable here. In the argument upon this point appellant does not complain of the findings of fact made by the trial court. A feeling of mutual confidence and trust, brought about by close relations, acts of kindness and friendship, frequently prompt gifts *inter vivos* or testamentary. Certainly there is nothing wrong with the fact they do so; neither does the law condemn such gifts. It is only when that relationship is used by one of the parties to take advantage of the other for financial gain that the law throws around such other its protecting arm to see that no undue advantage has been taken of the donor, and if the circumstances warrant, requires a showing of independent advice. Here the trial court found that Olson had mental capacity to enter into the transaction even though he was afflicted with some disabilities incident to advanced age, and that Olson knew and understood the purport of the instruments and their effect. It is not suggested that these findings are not supported by the evidence, or that there was any substantial competent evidence to the contrary. The court further found that the execution of the instruments came about as the result of a desire upon Olson's part to secure for himself a home, care and companionship for the remainder of his life and the care and disposition of his remains at his death, and to make a gift to the defendant Home, and that his decision to make such disposition of his property was voluntary upon his part. It is not contended these findings were not supported by the evidence, or that there is any substantial competent evidence to the contrary. The court found that Doctor Bergin had solicited the consideration of some kind of a gift to the Home. There is nothing wrong with that type of a suggestion. Homes of this character, of which there are several in this state, are maintained, in part at least, by gifts of those who recognize the need of such institutions and the good work they are doing. The court specifically found that there was no undue influence brought to bear upon Olson to bring about or cause him to execute the in-

struments in question. Those findings are amply sustained by the evidence; there is no serious contention to the contrary. The court found Olson did not have independent advice respecting the execution of the instruments. It is true there was no evidence that anyone talked over with him all the facts and circumstances which properly would have been taken into consideration in determining whether or not to execute the instruments and giving advice with respect thereto. It is in evidence, however, that he conducted his business before and after the date of the execution of these instruments with the assistance of Mr. Peterson, and no doubt, in many circumstances, with his advice, and that the instruments were prepared by Mr. Nyquist after a private discussion of the matter with Olson. Mr. Peterson was present when the instruments were executed, and testified that Olson examined the instruments and saw, "just what they were and knew what they were and then he signed them." The inference that Olson did have independent advice might have been drawn from those circumstances, and this no doubt prompted the court to find that under all the circumstances of the case such advice was not a prerequisite to sustaining the instruments.

Defendant was never the confidential agent or legal adviser of Olson, as those terms are used in the statute. (G. S. 1941, 59-605.) Defendant transacted his own business with the aid, primarily, of Mr. Peterson; perhaps some of it with the aid of Maupin or Nyquist. Defendant's relations with Olson, aside from the fact that he lived at the Home and paid a stipulated price for his care and maintenance, were more like that of parent and child or husband and wife, which, without more, do not create a situation in which independent advice is requisite to the sustaining of a gift. See *Carmen v. Kight*, 85 Kan. 18, 116 Pac. 231; *Woodworth v. Gideon*, 136 Kan. 116, 12 P. 2d 722. See, also, the following cases as having some bearing upon the question: *Ginter v. Ginter*, 79 Kan. 721, 101 Pac. 634; *Maddy v. Hock*, 134 Kan. 15, 21, 4 P. 2d 408; *Keefe v. Kill*, 135 Kan. 14, 9 P. 2d 640; *Edington v. Stine*, 135 Kan. 173, 10 P. 2d 27; *Klose v. Collins*, 137 Kan. 321, 20 P. 2d 494; *In re Estate of Horton*, 154 Kan. 269, 118 P. 2d 527. Appellant complains that the court did not make findings upon all the issuable and evidentiary facts as requested by plaintiff. Under our statute (G. S. 1935, 60-2921) the court is required, when requested, to make only "conclusions of facts." See discussion on this point in the opinion

and the dissenting opinion in *Nordman v. Johnson,* 94 Kan. 409, 418, 146 Pac. 1125; *Alexa v. Alexa,* 108 Kan. 38, 46, 193 Pac. 1083. The court is not required to make findings of "evidentiary facts." Naturally, if the court undertakes to do so it should find the evidentiary facts as disclosed by the evidence of both parties. See *Fuller v. Williams,* 125 Kan. 154, 264 Pac. 77, and authorities there cited.

Appellant complains of the findings Nos. 10 and 11, and the judgment of the court thereon and contends that the sum found to have been paid personally by Olson as necessaries should have been larger. About all that can be said on appellant's behalf in this respect is that the evidence on that matter was conflicting. There is an abundance of evidence to sustain the findings of the court to the effect that Olson while living at the Home desired to spend some of his money for things or services he wanted which were not necessities within the purview of their contract, and that he did so with full knowledge that he was paying for the things himself without any obligation on the part of the Home, and at least for the most part in harmony with the advice of his financial adviser, Mr. Peterson.

We find no error in the record of which appellant can complain. The judgment of the court below is affirmed.