No. 39,631

In re Estate of Grace Timken, Deceased. (J. V. BARNES, Administrator of the Estate of Mary Louise Crotinger, Deceased, *Appellant*, v. H. R. TIMKEN, Administrator of the Estate of Grace Timken, Deceased; H. R. TIMKEN, LOUISE STEINERT, and DOROTHY O'CONNELL, *Appellees*.)

(280 P. 2d 561)

Opinion filed March 5, 1955.

*James A. Williams* of Dodge City, argued the cause, and *C. W. Hughes*, and *Byron G. Larson*, both of Dodge City, and *Walter F. Stueckemann*, of Jetmore, were with him on the briefs for the appellant.

*John A. Etling*, of Kinsley, argued the cause, and *W. N. Beezley*, of Kinsley, and *E. A. Schwartzkopf*, of LaCrosse, were with him on the briefs for the appellees.

The opinion of the court was delivered by

ROBB, J.: This was an appeal from the order of the trial court denying appellant's petition for allowance of demand against the estate of Grace Timkin, deceased.

For convenience we will hereafter refer to Thomas H. Crotinger

as Thomas, Grace Timken as Grace, Mary Louise Crotinger as Mary, Douglas J. Kise as Kise, and O. A. Wilson as the attorney.

Thomas, a resident of Ford county, died testate on December 8, 1949, leaving Mary, his widow, all his property absolutely with full power of disposition, with the residue remaining at Mary's death going to his sister, Grace, or her heirs, absolutely. He left $1.00 to each of his eight children of a former marriage named in his will (only six of whom survived him) and finally, he appointed Mary as executrix and asked that she not be required to give bond. His will was admitted to probate on January 18, 1950. Mary declined to serve as administratrix with the will annexed and consented that Grace M. Timken (the same as Grace Timken) serve as administratrix with the will annexed. Grace qualified on January 18, 1950, and Mary on February 15, 1950, elected to take under the will. She continued to reside in the town property in Dodge City.

Grace attended to all the personal needs and requirements of Mary, as well as all the financial problems and accountings of the estate, because Mary was an elderly woman and her eyesight was very poor. Grace's care of Mary was made evident by two annual accountings filed in Thomas's estate. These accountings showed income from wheat pasture, leases, rents, bonds, dividend and revolving fund items in the Dodge City Co-operative, and insurance items in the receipt columns. For disbursements there were funeral expenses for Thomas, hospital, doctor, and nurses' bills, income taxes, house repairs, a monument, medicine, attorney fees, insurance, taxes, as well as plumbing and utility bills, care for Mary and, finally, the last illness and funeral expenses of Mary.

The property in the estate of Thomas was a 320 acre farm and the equipment thereon located twenty-two miles southwest of Jetmore in Hodgeman county, which was occupied and farmed by Frank Fromm. Mary owned the residence property in Dodge City and the household furnishings and effects therein contained in fee simple separate and apart from Thomas's estate.

Only one witness, a close friend, testified that Mary was subject to being influenced. The pastor of Mary's church, the tenant on the farm, her brother-in-law, and the oil lease broker testified that Mary was mentally competent to conduct business, competent to understand religious and business matters, that she knew her wants and made them known. They thought she could not be influenced.

Douglas J. Kise, an Oklahoma City oil lease broker, called on Mary on May 22, 1950, and offered her $1.50 per acre bonus and $1.00 delay rentals per acre for an oil lease on her farm. She requested that her attorney be present before there was any signing and asked Mr. Kise to call her attorney in Jetmore.

Grace and her husband, Timken, were approached in Dodge City at the Lora Locke Hotel by another oil lease broker, who offered $1.00 per acre for the Hodgeman county lease. They presented this offer to Mary, who rejected it in favor of Kise's offer.

After Kise called the attorney, he then telephoned Grace, since the court house records mentioned her in the will, and met her and her husband in the Lora Locke Hotel about 10:00 a. m. on May 23, 1950. They proceeded to Mary's home where the attorney, Mrs. Pennick the housekeeper, Grace, Timken, and Kise were all present. Kise requested the signatures on the lease of the six surviving Crotinger children, but Mary refused to do this because the land was hers. Mary further stated the land belonged to Grace and her, that Thomas had said the land was hers and Grace's, and that the will said the land was hers and Grace's. She also stated if there was some other way to prepare the papers, she would sign them; otherwise, she would not. Kise suggested a quitclaim deed to Grace from Mary reserving a life estate in the rents, royalties, bonuses, or other income, and he further stated he would accept the signatures of Mary and Grace alone on the lease if the deed was executed. Mary instructed the attorney to prepare the deed because that was what she, Mary, wanted, and it was the intention of Thomas's will that the land should go to Grace after Mary's death.

After sending Timken to the bank to get a notary, Kise and the attorney left the house and went to the attorney's car. The attorney prepared the quitclaim deed and Kise prepared the lease. All of them, including the notary, returned to the house and the attorney read and explained the papers, including the deed, to Mary. The attorney also explained to Mary that if she executed the deed and later wished to dispose of the property, she would have to obtain Grace's signature. Mary then stated that was what she wanted and she executed the deed and the lease.

Mary further stated she wanted the same kind of a deed executed on the home in Dodge City. The attorney subsequently prepared and sent that quitclaim deed to Mary. She executed the second

deed on June 21, 1950, in the presence of Grace, Timken, and a notary, who acknowledged it. Both deeds contained a consideration clause, "A valuable Consideration and One . . . and no/100 DOLLARS," and reserved a life estate in Mary. The deed on the Hodgeman county property was recorded on May 23, 1950, and the deed to the Dodge City property was recorded on June 21, 1950.

Grace continued caring for Mary and her needs both as to health and business up to the time of Mary's death, which occurred in Ford county on January 1, 1952. J. V. Barnes was appointed administrator of the estate of Mary. Grace, a resident of Rush county, died on January 7, 1952, and Timken was appointed administrator, c. t. a., *de bonis non,* of Thomas's estate. He filed the final settlement petition on February 11, 1952. The Ford county probate court ordered Thomas's estate closed and construed the will on April 3, 1952, as giving Mary fee simple title with Grace taking nothing, from which order no appeal was taken.

Timken was also appointed administrator of Grace's estate on June 11, 1953, after appellant had requested the probate court to appoint an administrator for her estate on November 28, 1952.

The quitclaim deed on the Hodgeman county land contained the following paragraphs:

"(The Grantor reserves to herself for as long as she lives all of the rentals, royalties, bonuses or profits of any kind or character arising out of said lands.)

"This Deed is given to carry out the terms of a will and no monetary consideration passes between the parties."

The quitclaim deed on the Dodge City property contained the following paragraph:

"(The Grantor reserves to herself for as long as she lives the full use of said property and all of the rentals and profits of any kind or character arising out of said real estate.)"

The record shows undisputedly that Grace and Timken were present during the execution and delivery of the deed on the Hodgeman county land, but they did not enter into the conversation or take part in the explanation concerning the deed. On this occasion they sat at the opposite end of the room from Mary.

Concerning the deed to the Dodge City property, the notary, R. C. Hill, Jr., made an affidavit wherein he stated that Timken read and explained the deed to Mary and then Mary signed

it. No attorney was present nor was anything mentioned in Hill's presence about Mary having independent legal advice. In neither instance when the deeds were signed did the record show any undue influence or duress on the part of Grace or anyone in her behalf.

The trial court made the following recital in its journal entry:

"At the times the deeds were executed in this case, a confidential relationship existed between Mary Louise Crotinger, the donor, and Grace Timken, the grantee. Equity, therefore, requires Grace Timken to show that she did not obtain the deeds through undue influence. *Henks v. Panning*, 175 Kansas 424.

"The real estate described in this action, belonged to Mr. and Mrs. Thomas H. Crotinger. Each wanted the residue of the real estate, after their deaths, to go to Grace Timken, a sister of Mr. Crotinger. This was Mr. Crotinger's desire as expressed in his will. This was Mrs. Crotinger's desire, also. She stated at the time she executed the deed to the farm land, that was the way her husband wanted it and that was the way she wanted it. And she wanted her attorney, O. A. Wilson, to make out a deed to the residence property the same way. This was done. All Grace Timken did was to accept the deeds. She did not ask, request, or prepare the deeds. The deeds were accepted by Grace Timken in good faith as a reward for services rendered. The will and deeds are the expressed voluntarily desires of the Crotingers, and a court of equity should not interfere. The petition for allowance of demand is denied."

The first legal question presented is whether the deeds are void or voidable. Appellant contends the deeds are void, but this court has held that an administrator is a fiduciary and owes the highest degree of loyalty to those interested in the estate. However, all transactions between an administrator and those interested in an estate are not void. A fiduciary must deal fairly with a beneficiary and communicate to him all material facts which the fiduciary knows or could know. Otherwise the conveyance may be set aside for fraud, duress, or undue influence. (*Nelson v. Gossage,* 152 Kan. 805, 808, 809, 107 P. 2d 682.) The deeds from Mary to Grace were not void, but may have been voidable. There is no showing in this record that Grace was trafficking in or making herself unjustly enriched as administratrix of the estate at the expense of the estate. On the contrary, the record discloses that Thomas had lived in the home of Grace and Timken for some two years after his divorce from Lucy (mother of the six Crotinger children) and until his marriage to Mary.

Appellant's next contention relates to the sufficiency of the

consideration. The trial court ruled that Grace accepted the deeds in good faith as a reward for services rendered. (*In re Estate of Nicholson*, 167 Kan. 14, 204 P. 2d 602.) Let us therefore, look at those services since it is fundamental that a dollar is only a nominal consideration when unaccompanied by valuable consideration. Mary was an elderly woman who had broken her hip and was almost blind. This made it necessary for her to be waited upon "hand and foot." Grace and Timken lived at Bison, Kansas, and they not only had had Thomas in their home for two or three years, from the time of his divorce from Lucy Crotinger in 1923 until about the time of his marriage to Mary, but after Thomas's death Grace made at least *one* and sometimes *two trips a week* to Dodge City, a distance of approximately eighty to eighty-six miles. On these occasions Grace would see that the nurse or companion who was hired to care for Mary was doing her job, would get groceries, stay all night to let the nurse off duty, pay bills, run errands, take care of needed repairs about the house and see that "Mary was O.K.," in the words of one witness. We must bear in mind, also, that this was no mother and daughter relationship, but was between a woman and her deceased husband's sister. This woman had declined to accept the capacity of representative of her husband's estate in favor of her husband's sister. The conclusion of the trial court on the reward for services was well founded.

Where the fiduciary relationship exists it must also be proved by the fiduciary that no undue influence, fraud, or duress was practiced upon the donor and beneficiary by the fiduciary or someone acting in the fiduciary's behalf. The donor must do the act with full knowledge of the result and must have independent advice in regard to the transaction and result. The burden of proving these matters rests upon the fiduciary and the trial court found that Grace did not obtain the deeds through undue influence. The rule is well stated in *Henks v. Panning*, 175 Kan. 424, 264 P. 2d 483, and cases therein cited. The facts in our case show the deeds were brought up by Kise, a stranger to both Mary and Grace. He was a lease broker and interested only in obtaining an oil lease on the Hodgeman county land. Mary, who was to receive all the proceeds from the lease, dictated the conditions under which she would sign the lease, required her attorney to be called, and then told the attorney how she

wanted both deeds drawn. There were seven people present and the evidence showed that Grace sat at the far end of the room. Grace was present only because her name was on Thomas's will and Kise had requested her presence. Kise told Mary how the lease could be executed by her and Grace without the Crotinger children having to sign, and since that was the way she, *Mary*, wanted it, he saw to it that that was the way it was done. As one witness said, Mary knew what she wanted and made her wants known.

The case of *Jernberg v. Evangelical Lutheran Home for the Aged*, 156 Kan. 167, 131 P. 2d 691, cited by appellees, is not in point because there was no fiduciary relationship, but it does cover undue influence, fraud, and duress, and the question of independent advice. In the Jernberg case and our case now under consideration, a lawyer read, explained and informed the donor concerning the facts, circumstances, contents and results of the transaction. The attorney in our case very definitely told Mary she would have to have Grace's signature along with her own and Kise explained that he would accept the lease when prepared in that manner. Appellant contends the lawyer was obligated to both Mary and Grace, but there is no evidence or contention that the lawyer was not qualified or that he did not act in good faith. Appellant also says Kise was trying to get an oil lease from Grace. This must be an error because Kise was trying to get the lease from Mary, not from or for Grace, but for his principal, Willard L. Miller of Oklahoma City. Whether Kise's statements were meritorious or otherwise, the lessee paid Mary rentals and later paid them to Timken.

Grace further showed lack of fraud, duress and undue influence by her continued care and activities subsequent to the time the deeds were delivered to her and prior to Mary's death.

Some other authorities supporting the rulings on undue influence and independent advice are 2 Bartlett's Kansas Probate Law and Practice, rev. ed., chap. 28, § 619, p. 162; 24 Am. Jur., Gifts, § 49, p. 756, § 50, p. 757; 38 C. J. S., Gifts, § 34. See, also, *In re Estate of Purdom*, 175 Kan. 874, 267 P. 2d 472.

Another question raised is whether the claim is barred by the statute of limitations. However, in view of the preceding, we do not think its is necessary to consider the matter in this case.

We find no error in the judgment of the trial court and it is affirmed.