No. 43,420

Charles S. Scott, Administrator of the Estate of Elisha Scott, Deceased, *Appellant,* v. Chester F. Farrow, Executor of the Estate of Gertrude Farmer, Deceased, *Appellee.*

(391 P. 2d 47)

Opinion filed April 11, 1964.

*Chester I. Lewis,* of Wichita, argued the cause, and *Charles S. Scott, Elisha Scott,* and *Samuel C. Jackson,* all of Topeka, and *E. R. Aikens III,* of Wichita, were with him on the briefs for the appellant.

*George D. McCarthy,* of Wichita, argued the cause and was on the briefs for the appellee.

The opinion of the court was delivered by

ROBB, J.: The ejectment action involved in this appeal was commenced on September 29, 1961, by the late Elisha Scott wherein he claimed ownership of the legal title and right of possession to certain real property, known as 1301 Cleveland, in Wichita, Kansas, by reason of a general warranty deed dated June 13, 1956, from Doctor J. E. Farmer and his wife, Gertrude Farmer. The trial court gave judgment to defendant and plaintiff appeals.

At the time the action was filed on September 29, 1961, both the doctor and Gertrude were deceased. The deed attached to the petition showed the doctor and Gertrude had each reserved a life estate in the property, and the petition alleged Elisha was, therefore, the owner of the indefeasible fee simple title to the real property, was entitled to immediate possession thereof, and had on August 23, 1961, caused notice to vacate to be served on defendant.

Defendant filed his answer and included a cross petition setting forth that Gertrude had died testate on August 11, 1960, and on September 29, 1960, defendant had been appointed acting executor of her estate and is now so acting.

On August 8, 1958, Gertrude executed her last will and testament devising and bequeathing all her property, real and personal, including the property in question. Defendant had no knowledge of the existence of the deed, or the claims of Elisha until September 4, 1961, when the notice to vacate was served upon him. It was further alleged the doctor and Gertrude did not make, sign, or acknowledge Elisha's warranty deed and the deed was false, fraudulent, and forged, but if this was not true, the deed was not delivered to Elisha during the lifetime of the doctor and Gertrude, making the deed invalid, void, of no force or effect, and as recorded, clouded the title. Further, no consideration ever passed in return for the execution of the deed or any consideration if found, was so grossly inadequate as to constitute fraud and flagrant abuse of a fiduciary and attorney-client relationship. If Gertrude signed the deed, she did not understand the nature and effect thereof and it

was not her free and voluntary act and was, therefore, not binding upon her. Due to her age and recent illness Gertrude was incapable of transacting and carrying on business of any kind. Elisha had, without any consideration, intentionally cheated and defrauded Gertrude, and finally, she believed until the day of her death that she had a right to dispose of the property by will. Defendant sought to have the deed cancelled and expunged from the records.

For his reply plaintiff, on March 17, 1962, filed a general denial.

Plaintiff's evidence, from the testimony of Maxine Owens (now an employee of the Welfare Department in Los Angeles, California), who had formerly been secretary to Benjamin H. Brown and Theo. R. Gardner, Wichita, attorneys, was that she had performed legal services for Elisha when he came to Wichita from Topeka. She had been to the residence of the doctor and Gertrude several times because Elisha had performed legal services for the Farmers. On June 12 or 13, 1956, she had been called to cancel the power of attorney previously given to Jeanette Jackson. The doctor and Gertrude executed a power of attorney to Elisha which document was typed and notarized by Maxine after Elisha explained to the Farmers that he practiced law out of the state and might not always be able to come. The doctor stated that Elisha had been such a faithful friend through the years, that they had never been able to repay him for his services, and they wanted to execute the deed to him even though Elisha told them that was not necessary and objected thereto because he was a Topeka resident, well established, and had done things for them out of friendship. However, the doctor insisted and Maxine wrote down the statements at the doctor's direction. She went to her office and typed the form of the deed but forgot to include the clause for reservation of life estates for both the Farmers. The doctor said this would never do and she was directed to type the reservation in the deed, which she did. The doctor and Gertrude signed the deed and Maxine acknowledged their signatures. Maxine stated that both the doctor and Gertrude were competent or she would not have notarized their signatures because she would not notarize the signature of any person she thought was incompetent. There was further conversation regarding an automobile but Elisha refused either to take the automobile or sell it. The doctor wanted the deed recorded immediately and had so stated after its execution, but he finally

gave the deed to Elisha. Three or four days had expired between the execution of the power of attorney and the execution of the deed. The first that Maxine had heard about the deed was at the time the first power of attorney was cancelled. Ted Gardner also was present when the original deed was discussed but he was not present when the corrected deed was brought back.

Morgan Smith, a neighbor, had been told by the doctor he would not mind seeing Elisha have the home, and Smith testified that on the date of the execution of the deed, both the doctor and Gertrude were competent. They were both very curt and had command of things. Smith knew Elisha from seeing him at the doctor's home many different times and the doctor always referred to Elisha as, "That's my boy." Smith brought Gertrude home from the hospital in November, 1955, but he did not know "what her ailment" was.

Theodore R. Gardner, an attorney, knew and had also represented the doctor and Gertrude. He knew they were both astute business people who held extensive real estate holdings ranging from seventeen to twenty-five pieces of property. Gertrude was intelligent and had taught school for several years. Gardner had taken Elisha to the doctor's home on the evening in question and after it was signed and notarized, he saw the warranty deed but it did not contain the reservation of life estates. The Farmers handed the deed to Elisha. Elisha said there was no hurry about recording but the doctor requested Gardner to take him (the doctor) to record the deed. However, due to the late hour and the fact the court house was closed, Elisha said to wait and he just put the deed into his pocket. At the time Gardner saw the deed he saw one "x" on it and the clause reserving the life estates did not appear thereon.

Gardner further testified he had taken Elisha to the doctor's home on his way to his own home. Gardner had met the doctor and Elisha at the same time in 1937 or 1938 on the occasion of a Masonic meeting in Kansas City, Kansas. He knew the doctor and Gertrude were rational and normal in every way on this occasion. He knew the doctor was a "reserved personality and pretty strong-willed" while Gertrude was an "intelligent type of person" and no one could put anything over on her very easily. She had carefully read the deed before signing it.

Jeanette Jackson, who had originally had power of attorney for

Gertrude, was a defense witness. She testified Gertrude did not have any mental impairment that prevented her from knowing what she was doing and although she had had a stroke it had only affected her speech, which later became better. They drove around in Gertrude's Cadillac and collected rents and paid utility bills. Jeanette did the driving because Gertrude could not drive.

There was evidence of some conversations about the Cadillac but we are not concerned with that herein.

Myrtle Bell, a defense witness, testified Gertrude had suffered a little illness but she was competent, her mind was good, and she was able to transact business and was aware of things around her.

Jenny McClain (also spelled McLain and McLaine), another defense witness, testified she had accompanied Gertrude to defendant's office on one occasion after Jeanette Jackson had objected to Gertrude selling her Cadillac. Gertrude asked defendant for a lawyer and he referred her to Mr. Garrett. Jenny testified on cross-examination that Gertrude had a speech impairment but she was around her so much she could understand what Gertrude said, Gertrude's mind was not impaired as a result of the speech impairment but somebody could take advantage of Gertrude. Jenny knew Elisha and that he was to take over Jeanette Jackson's power of attorney. She was with Gertrude almost every day from 1956 until Gertrude's death. Jenny was not related either to the doctor or Gertrude but was a devisee under Gertrude's will. None of the devisees under Gertrude's will was related to Gertrude by blood.

Defendant had known the doctor and Gertrude since 1950 and had made Gertrude's tax returns every year and he saw her every year except 1956 when she had someone else bring in the information for her return. He was not certain whether it was Jeanette Jackson or Louise Thompson. On September 27, 1956, the doctor and Gertrude had come to defendant's office accompanied by Jenny McClain and Lennie Cunningham. The doctor and Gertrude had told him that Elisha had taken some papers, including deeds and abstracts, and they wanted him to "help them get them back." They wanted to employ an attorney. Defendant took the Farmers to Mr. Garrett's office. Defendant further testified that according to the information he had of her records, Gertrude had never paid Elisha on any statements. Defendant knew of many real estate transactions conducted by the doctor and Gertrude. After her

stroke in 1956 there was a noticeable difference in her condition in that she was more feeble, showed signs of having had an illness, and was slower thinking. She also had a speech defect.

Defendant had on two occasions after September, 1956, tried to help the doctor and Gertrude plan their wills. Gertrude had attended the Logopedics Institute in Wichita for her speech defect.

Counsel then asked defendant the following:

"Q. . . . they were incompetent when they signed the deed, but competent when they executed the will, is that it?

"A. That was over a long period; there would have been other medical aid given to them, to Mrs. Farmer in the meantime."

Defendant had worked with Gertrude on her will over a long period of time. Three or four different wills had been drawn before she signed the one in question.

Lennie Cunningham, the next defense witness and the principal devisee in Gertrude's will, testified that when Jenny McClain moved into Gertrude's home, Gertrude told Jenny she had decided to give the home to Lennie, but in her will she left it to Louise Thompson. Lennie further testified she did not know what they called "mentally incompetent" but Gertrude just did not get things like she had before she got sick and they would have to go over and over things before she would understand. Lennie testified Gertrude was upset when some papers were gone from a chest in her upstairs bedroom and the doctor was upset over Elisha's failing to deposit the proceeds of a check received for the sale of the Cadillac.

However, the record shows the proceeds of the check were later deposited by Elisha and that he turned over to Mr. Garrett some sacks full of deeds, mortgages, and abstracts.

Louise Thompson, another defense witness, testified that Elisha and Jenny McClain came to her house in the summer of 1956 and told her Elisha had come to Wichita to write a will for Gertrude and he wanted information from her regarding Gertrude's properties, transactions, business dealings, and income. When she was asked about Gertrude's competency, Louise said, ". . . competency is something that is rather relative . . .," that Gertrude had to have help with her speech and in calling people's names, but she knew what she wanted to do and if that was competency, she would say Gertrude was mentally competent.

The last defense witness, Lee Garrett, a Wichita attorney, testified that on September 27, 1956, the doctor, Gertrude, Lennie Cun-

ningham, and Jenny McClain came to his office. They had been brought there by defendant. The doctor did most of the talking and explained to Mr. Garrett that a quantity of papers had been taken from their home by Elisha and they wanted Mr. Garrett to take steps to secure their return. The doctor told Garrett he would have to watch Elisha because he was "very slick." Mr. Garrett came to Topeka and obtained the three sacks of papers and documents from Elisha after Elisha's secretary had made a list thereof and Garrett had signed the list. Mr. Garrett asked Elisha if that was all the papers, documents, and instruments of any kind in Elisha's possession that *belonged* either to the doctor or to Gertrude, and Elisha assured him it was. Garrett then requested Elisha to submit a bill for his services, but he never heard from Elisha. The three sacks of documents were taken to the home of the doctor and Gertrude and turned over to them.

In October, 1957, just before the doctor's death on October 31, 1957, Mr. Garrett discussed drawing a will for the doctor and Gertrude. He asked the doctor what his wishes were and he said they were whatever Gertrude wanted. Mr. Garrett handled the administration of the doctor's intestate estate. On April 10, 1958, he mailed a rough draft of a will to Gertrude for her to read and think about and see if it met with her approval. At first she wanted to leave the home and furnishings to the church as a parsonage because the minister was her good friend. However, she found that the minister's successors would live in the home and this she did not want. There were nice antique furnishings in the home and she left it and the contents to Louise Thompson, a long time friend, who could appreciate them. On August 8, 1958, Gertrude, as sole owner of the property, executed the will in Garrett's office.

Garrett further testified that on September 27, 1956, Gertrude was not capable of understanding a transaction unless it was explained to her in considerable detail and she was in the same condition on November 14, 1956, when she affixed her signature to a letter written by Garrett to Elisha. Garrett testified that in June, 1956, Gertrude was physically and mentally incapable of understanding anything of a legal nature unless it was explained to her "very, very, very thoroughly" and even then he could not tell whether she understood or not. Gertrude had never told Garrett that Lennie Cunningham was to have the home property any more than she had told him she had deeded it to Elisha. She had told him she had given a power of

attorney to Elisha and she thought Elisha had drawn a will for her and these two facts perturbed her. Garrett told Gertrude that any power of attorney she had given would expire upon her death and any previous will would become ineffective by her later will.

In rebuttal testimony, Elisha, who had known Gertrude when she had taught school in Topeka before she married the doctor, undertook to explain about the three sacks of documents but the trial court sustained an objection of defendant's attorney thereto because it involved a transaction with a deceased person, and Elisha was able to state only that he knew what had happened to the deeds and abstracts, which had been located in a box in an upstairs bedroom of the Farmers' home, and that the papers he gave Mr. Garrett were those instruments. The court limited Elisha's further testimony to answering the question—"Did you surreptitiously take these papers out of this box upstairs?" To which question Elisha answered, "Positively not." After much colloquy between the court and counsel, Elisha's attorney admitted that the doctor, now deceased, was a party to the deed. Elisha's attorney suggested there had been a waiver of the rule on the admissibility of evidence and that Elisha's rebuttal testimony was admissible because although it involved a transaction with a deceased person, defendant's witnesses had been allowed to testify on the point and Elisha should be allowed to rebut it.

We pause to comment that defendant herein filed a voluminous counter abstract in question and answer form, the major portion of which is repetitious of the record contained in the abstract and this has caused the court an unnecessary amount of work. We wish to caution attorneys against submitting records in this form as this should not be done in appeals before appellate courts. (Rules of Supreme Court No. 6 (e), 191 Kan. xv.)

We shall turn first to the paramount issue in this case which is whether Gertrude at the time she executed the deed had sufficient mental capacity to know the nature and terms of the contract. Generally speaking, the infirmities of a contract are required to be proved by the party asserting such infirmities (*Jernberg v. Evangelical Lutheran Home for the Aged*, 156 Kan. 167, 172, 173, 131 P. 2d 691; *Palmer v. The Land & Power Co.*, 172 Kan. 231, 238, 239 P. 2d 960; 17 C. J. S., Contracts, § 133 [1] e., p. 861; 12 Am. Jur., Contracts, § 144, p. 637) but under the facts and circumstances of this case where a fiduciary relationship of attorney-client existed

and the grantors in the deed were clients of the grantee, who was an attorney, the burden is upon the party relying upon the deed to show consideration and to show also the absence of incompetency, mental incapacity, fraud, duress, undue influence or overreaching (12 Am. Jur., Contracts, § 148, p. 641; 7 Am. Jur. 2d, Attorneys at Law, § 97, p. 109) and finally, in 7 C. J. S., Attorney and Client, § 129, p. 971, it is stated that while gifts from clients to attorneys during the fiduciary relationship were absolutely precluded in some of the earlier authorities, most of the modern cases hold a gift is not void *ipso facto* if it is clearly proved by the attorney that the client acted voluntarily with full knowledge of all the material facts and no undue influence was exercised by the attorney.

In *Mann v. Staatz,* 156 Kan. 275, 133 P. 2d 103, a mother executed a deed to her younger son on January 4, 1939. The record showed she stated that her mind wandered away, that she was quite prone to forget incidents involving her business affairs, and she had agreed with the family to the appointment of a guardian a few months before she became ninety years of age on March 8, 1939. The evidence (p. 279) was that the day following the execution of the deed, the mother had hallucinations "about chickens being on the bed and about men on the ceiling" and this established the fact the mother had been wholly incompetent to transact business or to execute the deed on the particular day in question. In the opinion it was stated (p. 281) that when the mother's incompetency was so established, the lawsuit was ended since her incompetency made the instrument without legal effect, and questions of undue influence and lack of adequate consideration were, therefore, immaterial. It is to be noted no such facts or circumstances were established in our present case.

It may readily be perceived from portions of the testimony heretofore set out that plaintiff's evidence established a *prima facie* case that Gertrude was competent, she knew what she was doing, and her act in executing the deed was voluntary, independent, and in total disregard of statements made by Elisha that he was a Topeka resident, he owned his home and was well established in Topeka, and the deed was not necessary. He had even objected to their granting power of attorney to him because of his extensive practice of law in many other states which meant he might not always be available when needed. This evidence was well estab-

lished by the testimony of at least three competent witnesses who at the time of the trial had absolutely no interest in the subject matter or the parties in the lawsuit. Such evidence apparently was in the mind of the trial court when it overruled defendant's demurrer to plaintiff's evidence. No appeal was taken therefrom by the defendant and he went forward with his evidence placing the testimony of his witnesses into the record which reflects they did not testify Gertrude was mentally incompetent, but rather, they testified she was well trained by experience in dealing with numerous abstracts, deeds, and mortgages, as well as other matters involved in transfers of real property. It was admitted Gertrude had a physical impairment of her speech and of her muscular co-ordination in writing as a result of the stroke she had suffered in November, 1955, all of which would appear to show the correctness of the trial court's order overruling the above-mentioned demurrer. (*Henks v. Panning,* 175 Kan. 424, Syl. ¶ 3, 264 P. 2d 483.) We cannot ignore the evidence of plaintiff's witnesses Gardner and Owens, who were disinterested parties and the only ones actually present at the time of the transaction, which showed, and such evidence was not disputed, that the Farmers had discussed the matter of the deed between themselves and had agreed on this transaction prior to any knowledge thereof on the part of Elisha, the grantee, or the scrivener, Miss Owens, who was required to make an extra trip to the Farmers' home to be sure the life estates were reserved to the grantors, as directed by Doctor Farmer. It is inconceivable that Doctor Farmer would take part in such a transaction had he known that Gertrude was mentally incompetent. To say the least, Gertrude had the assistance, and independent advice of her husband, Doctor Farmer, who co-signed the deed with her. Any dissimilarity between her signature on the deed and that of her other signatures was fully and completely explained by witnesses for both parties testifying that after she had had a stroke she had difficulty in writing her name and had attended the Logopedics Institute for correction of defects in her speech and writing. The result is we cannot say that Gertrude did not have independent advice when she and her husband decided to give Elisha their home at the expiration of their life estates therein. (*In re Estate of Timken,* 177 Kan. 545, 280 P. 2d 561.)

The judgment entered by the trial court finding generally in favor of defendant carries with it a finding in favor of defendant

on all material issues involved, and if such findings are supported by competent, substantial testimony, they will not be disturbed on appeal. Therefore, this court must determine the legal principle whether there is any evidence to support a finding of incompetency. In view of this record and all that has been stated herein, we must conclude there was no evidence whatever to show Gertrude was incompetent and obviously the evidence showing she was competent was totally disregarded by the trial court in its general finding and judgment. Thus the trial court's judgment on this issue alone cannot stand. (*Tucker v. Hankey,* 173 Kan. 593, 599, 250 P. 2d 784; *Grandi v. Thomas,* 192 Kan. 741, 391 P. 2d 35, this day decided.)

Plaintiff complains the trial court erred in not allowing Elisha to explain how he came into possession of certain documents which he turned over to Mr. Garrett upon the latter's visit to Topeka subsequent to letters written by Mr. Garrett demanding the return thereof. We cannot understand why the trial court excluded this rebuttal testimony of Elisha in view of the provisions of G. S. 1949, 60-2804, commonly called the "dead man's statute," and our rule enunciated in *Briscoe v. Reschke,* 170 Kan. 367, 226 P. 2d 255:

"Where the plaintiff in a lawsuit offers testimony consisting of conversations with a deceased person without objection, it is not error to permit the defendant to offer testimony of a like character on the same matters inquired into by the plaintiff." (Syl. ¶ 2.)

Nevertheless we are of the opinion in this particular instance such erroneous ruling did not prejudice Elisha's substantial rights.

Contentions in regard to duress, coercion, undue influence, fraud, or overreaching on the part of Elisha have already been fully answered herein since this record shows no evidence from which it may even be inferred that the Farmers looked to or sought any advice or counsel from Elisha with respect either to the power of attorney or the transfer of the real property. Although there may have been power, motive, and opportunity to exercise undue influence or overreaching, this alone is not sufficient to authorize the inference that such were in fact exercised and this is especially true where all the evidence directly bearing on the point clearly established the execution of the deed was the free and voluntary act of the Farmers. (*In re Estate of Crawford,* 176 Kan. 537, 542, 271 P. 2d 240.)

Turning finally to the question of consideration, aside from the

fact the transaction involved a gift, the Farmers apparently considered and determined between themselves that the legal assistance Elisha had given them over the years was sufficient consideration, they executed the deed in question as their free and voluntary act, and in addition, there had to be delivery of the deed to Elisha as he had to have it in his possession in order to be able to record it after the termination of the life estates.

Our conclusion is the trial court erred with respect to all the issues it determined in its general finding and judgment in favor of defendant, and in its order denying plaintiff's motion for new trial.

Judgment reversed with directions to enter judgment for plaintiff.

FONTRON, J., not participating.

SCHROEDER, J., dissenting: In this case the question confronting the court is whether there is *any evidence* presented in the record to sustain the finding of the trial court. In my opinion there is evidence to sustain the trial court's finding in favor of the defendant which in turn supports the order canceling the deed conveying the property in question to Elisha Scott, an attorney for Dr. Farmer and Gertrude Farmer at the time the deed was executed.

Referring to Gertrude Farmer at the time the deed was executed, Jenny McClain testified on cross examination:

"Q. Do you think anybody could have taken advantage of this astute business woman?

"A. Yes, they could take advantage of her."

When this testimony together with all of the other evidence adduced in the case is considered, bearing in mind that Elisha Scott was the attorney for Dr. Farmer and Gertrude Farmer at the time of the execution of the deed in question, it is, in my opinion, sufficient to sustain the finding of the trial court in favor of the defendant.

The attorney and client relationship is fiduciary in its nature and a very delicate, exacting and confidential relationship which requires a very high degree of fidelity and good faith. It involves the highest personal trust and confidence. The attorney is bound to discharge his duties to his client with the strictest fidelity and to observe the highest degree of good faith. All dealings between attorney and client are closely scrutinized by the courts, and transactions between the two are often declared to be voidable which would be deemed unobjectionable between other persons. The attorney cannot allow his private interests to conflict with those of his client or take any

personal advantage of, or any benefit from, his client, unless he first advises him to take independent advice. Conveyances which an attorney takes from his client, while the relationship of attorney and client exists, are presumptively invalid or fraudulent. (7 Am. Jur. 2d, Attorneys at Law, §§ 94, 95 and 97; 7 C. J. S., Attorney and Client, § 128; and *Neihart v. Buek,* 50 F. 2d 367.)

For Kansas cases involving the attorney and client relationship see, *Yeamans v. James,* 27 Kan. 195; *Haverty v. Haverty,* 35 Kan. 438, 11 Pac. 364; *Cunningham v. Jones,* 37 Kan. 477, 15 Pac. 572; *Holmes v. Culver,* 89 Kan. 698, 133 Pac. 164; *Wigton v. Donnelly,* 122 Kan. 796, 253 Pac. 400; *Yeoman v. Morris,* 135 Kan. 566, 11 P. 2d 683; and *Henks v. Panning,* 175 Kan. 424, 264 P. 2d 483.

In *Henks v. Panning,* supra, it was said in Syllabus ¶ 2:

"When it has been established that one person has acquired an interest in real estate, purchased and paid for by another, at a time when a confidential or fiduciary relationship existed between them the burden is cast on the person claiming such interest to show affirmatively that it was acquired in good faith, without undue influence, and for a valuable consideration."

It is respectfully submitted the judgment of the lower court should be affirmed.

Price, J., concurrs in the foregoing dissenting opinion.