No. 45,054

EDWARD CERSOVSKY, *Appellant*, v. PAUL CERSOVSKY, ROBERT CERSOVSKY, and MAURICE CERSOVSKY, and the FARMERS AND MERCHANTS STATE BANK OF COLBY, KANSAS, *Appellees*.

(441 P. 2d 829)

Opinion filed June 8, 1968.

*Clarence Bender*, of Hays, argued the cause, and *Selby S. Soward*, of Goodland, was with him on the brief for the appellant.

*Leon N. Roulier*, of Colby, argued the cause, and *Keith R. Willoughby*, of Colby, was with him on the brief for the appellees.

The opinion of the court was delivered by

O'CONNOR, J.: On September 5, 1963, Edward Cersovsky (appellant), the owner of three quarter sections of land in Thomas county, entered into separate contracts of sale with his three nephews, Paul, Robert and Maurice Cersovsky (appellees), and executed three deeds conveying one quarter section to each of them. The contracts and deeds were placed in escrow in the Farmers and Merchants State Bank of Colby. This appeal grows out of an action thereafter instituted by Edward against the nephews to cancel the contracts

and deeds. From an adverse judgment rendered by the district court in favor of the nephews, Edward has appealed.

The over-all question is whether or not the contracts and deeds constitute valid, bona fide conveyances of the properties in question.

Although the evidence was sharply conflicting in many respects, that tending to support the trial court's findings of fact will be summarized.

Edward, who was seventy-six years of age at the time of trial (April 1966), had owned the land for many years. He lived in a small house located on one of the tracts. Paul lived on a nearby farm, and between 1959 and 1962 had done custom cutting for his uncle during harvest. Edward had several conversations with his nephews during the years 1959 to 1962 and expressed an interest in selling the land to them. About harvesttime in the summer of 1963, the discussions, particularly those with Paul, became more definite, with Edward wanting the transaction completed before a crop was sown in the fall. The final details were agreed on, and the contracts and deeds, dated September 5, 1963, were prepared by Mr. Keith Willoughby, Paul's attorney. Thereupon, the documents were executed by the necessary parties and placed in escrow. The terms of each contract provided that the purchase price of a quarter section was $20,000, with no down payment; the purchase price was to be paid out of the yearly income from the property at the rate of fifty per cent of "all income from said land"; the unpaid balance was to draw no interest; the buyer was to pay 1963 taxes; and the seller was to give immediate possession.

After the papers were signed, Edward inquired of Paul if they "were going to push him off the land," to which Paul responded that Edward could live in the house the rest of his life.

The nephews proceeded to take possession. Paul, with Edward's help, put in the small-grain crop in the fall of 1963. Edward drilled one quarter and Paul two quarters. Each of the nephews paid Edward for fuel and seed used in the sowing operation. Sometime in December Edward returned the checks to the nephews with the explanation that he did not want to pay income tax on the money received from them. When the boys attempted to pay the 1963 real estate taxes in the latter part of November, they found the taxes had already been paid by Edward.

Three or four months after the contracts were signed Edward became dissatisfied and told the boys he wanted to make some

"small changes" in the contracts. He indicated he wanted Paul and Robert to switch quarters, and also, that he wanted to fix it so in case something happened to him, the balance of the purchase price due under the contracts would go to a charity in Chicago. Paul suggested to him that the latter change should be taken care of in a will.

During harvest in 1964, Edward's dissatisfaction became more manifest. Paul, with the help of custom cutters, harvested the grain. Paul left instructions with the manager of the local grain elevator that one-half of any grain sold belonged to the nephews, and one-half of all sales was to apply on the contracts held in escrow by the bank. Edward, however, insisted on claiming the entire crop, and paid Paul for his cutting, just as he had for several years prior, saying, "This is the way we are going to do it." According to Paul, Edward kept "harping" about new contracts and considered the old contracts no longer binding.

Again in November 1964, when the boys attempted to pay the real estate taxes, they found them paid. Edward admitted he had gone to the county treasurer's office prior to November 2 and left the money, with instructions to pay the taxes just as soon as they were payable.

As an interesting sidelight, there was evidence that Edward had sold the same three quarter sections of land to Paul in 1952 for the total price of $9,000. Shortly thereafter Edward became dissatisfied with the deal, and the following spring claimed all the crop. Rather than cause "a lot of family trouble," Paul returned the deeds, which had not been recorded, and Edward returned the purchase money.

After Edward's demand for return of the contracts and deeds went unheeded, he filed this action in July 1965, asking that the instruments be canceled on the basis that it was the intention of all parties that neither the legal nor equitable title was to be conveyed, and that he was induced to execute the instruments by undue influence and fraudulent representations on the part of the nephews.

In support of his petition, Edward testified he was involved in a car-truck collision on June 20, 1963. His version of the accident was rather bizarre in many respects. Edward was of the opinion that the other driver involved intentionally ran into Edward's truck and then covered his face with a red substance resembling blood

in order to appear seriously injured. Following the collision, Edward began receiving letters from the Motor Vehicle Department concerning his obligations under the financial responsibility act. Convinced in his own mind that the accident was some sort of a scheme to get money from him, and alarmed that a large personal injury suit could result whereby he would ultimately lose his land, Edward confided his fears to Paul. According to Edward, Paul suggested that he could avoid losing the land in a lawsuit if he would convey the property to the three nephews, for if he didn't own any property "they" couldn't sue him. Pursuant to Paul's suggestion, Edward executed the contracts and deeds. Edward maintained he "didn't sell them the farm for keeps." Paul, as well as the other nephews, vigorously denied Edward's testimony. Actually, the accident resulted only in property damage to the other vehicle in the amount of $794. We were told in argument that a lawsuit was eventually filed against Edward and a default judgment for property damages was rendered against him.

To further substantiate his claim, Edward testified he continued to live on the property and farm the land just as he had in the past; that notwithstanding the provisions in the contracts, he paid the real estate taxes, helped put in the crops, and paid Paul for harvesting the grain.

The trial judge who heard the case without a jury obviously was not impressed with Edward's account of the transaction, for he found that (1) the contracts were supported by valuable consideration, (2) the contracts and deeds were executed with the intent that they be valid, binding obligations of the parties, (3) the instruments constituted bona fide conveyances of the property, (4) Edward placed the nephews in possession in September 1963, and the nephews planted the fall crops and paid Edward for the seed used, (5) the nephews exerted no undue influence, nor did they make any false representations to induce Edward to convey the property, and (6) the nephews were entitled to specific performance of the three contracts.

Although Edward raises several points on appeal, they, with one exception, deal with sharply disputed factual issues resolved by the lower court. No useful purpose would be served by setting forth additional evidence in support of Edward's petition. We, as an appellate court, are not concerned with conflicting evidence or the weight and credibility of the witnesses' testimony; the trier of facts

has the responsibility of weighing the evidence and determining what testimony will be believed. We are interested only in evidence which supports a trial court's findings and not with that tending to establish findings to the contrary. If the record discloses substantial competent evidence to support the findings of the trial court, they will not be disturbed on appeal. (*Service v. Pyramid Life Ins. Co.,* 201 Kan. 196, 440 P. 2d 944; *Griffin v. Price,* 199 Kan. 649, 433 P. 2d 464; *Horton v. Montgomery Ward,* 199 Kan. 245, 428 P. 2d 774.) We have no hesitancy in saying that the facts previously narrated, as revealed by the record, amply support each of the findings of the trial court.

Edward makes the point that from uncontradicted evidence undue influence was shown as a matter of law. This contention is predicated on the alleged unconscionable and unfair terms of the contracts, along with Paul's admission that he was probably the person "closest" to his uncle and Edward relied on him a great deal.

As a general rule, what constitutes undue influence is a question of fact and depends on the circumstances of each particular case. (25 Am. Jur. 2d, Duress and Undue Influence § 49.) In order for a court to be justified in setting aside a deed on the ground of undue influence, it must be proved that at or about the time of the execution there was an influence bearing upon the will of the grantor so potent as to destroy his free agency and to substitute the will of another. Undue influence does not consist of mere gratitude for kindness, affection or esteem where a conveyance is induced thereby, nor does it operate in the way of suggestions, entreaties or importunities, short of overpowering a grantor's will. (*Linn v. Blanton,* 111 Kan. 743, 208 Pac. 616; *Smith v. McHenry,* 111 Kan. 659, 207 Pac. 1108.) The test of undue influence is whether the party exercised his own free agency and acted voluntarily by the use of his own reason and judgment, which may be determined from all the surrounding circumstances, including the relation of the parties, the time and manner of making suggestions or giving advice, the motive, if any, in making suggestions, and the effect upon the party so acting. (*Homewood .v. Eggers,* 132 Kan. 256, Syl. ¶ 5, 295 Pac. 681.) The mere fact there may have been power, motive and opportunity to exercise undue influence or overreaching does not permit the inference that such influence was exercised. (*Scott, Administrator v. Farrow, Executor,* 192 Kan. 666, 391 P. 2d 47.)

In a proper case, undue influence may be inferred because of the

confidential or fiduciary relation between the parties. In such instance the relationship itself implies a condition of superiority of one party over the other, and the superior party, seeking to uphold the validity of a conveyance for his benefit, has the burden of showing that the conveyance was made in good faith and for a valuable consideration. (*Nelson, Administrator v. Dague,* 194 Kan. 195, 398 P. 2d 268, and authorities cited therein; *Smith v. McHenry,* supra.) Whether or not a fiduciary relation exists depends on the facts and circumstances of each individual case. While it may exist under a variety of circumstances, it does exist in those cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing the confidence. (*Nelson, Administrator v. Dague,* supra; *Lindholm v. Nelson,* 125 Kan. 223, 264 Pac. 50.)

In light of the foregoing authorities, we cannot say that the uncontradicted evidence relied on by Edward constitutes undue influence as a matter of law. Although Edward may have relied on Paul in many respects, there was evidence tending to show that Edward was a strong-willed individual. As early as 1952 he manifested a desire that Paul have this land. For two or three years prior to the present transaction Edward had told the three boys he wanted to sell the land to them. Even at trial Edward said he wanted the nephews to have the property when he was gone. There was no evidence that the purchase price disclosed in the contracts was grossly inadequate or unfair, nor can it be said the other terms were so overreaching as to infer undue influence. There was testimony that most of the essential terms of the contracts were determined by Edward himself. While Edward may have possessed eccentric qualities, no question is raised regarding his competency to handle his business affairs. The evidence falls short of establishing facts and circumstances from which it may be inferred that Edward was deprived of his own free will and agency in the execution of the instruments of conveyance. Even if a confidential relationship existed between Edward and his nephews, particularly Paul, there is ample evidence in this record to warrant a finding that the nephews sustained their burden of showing the contracts and deeds were made in good faith and for valuable consideration. The trial court's determination that there was no undue influence must therefore be sustained.

The judgment is affirmed.