OPINION AND ORDER
GARY P. SULLIVAN, Chief Justice.
BRIEF FACTUAL OVERVIEW AND PROCEDURAL HISTORY
Lucille Lulu Davis Snell (hereafter “Lucille” or “decedent”) was the mother of five children; four daughters, Agnes Ward, Margaret Big Leggins, Rosemary Mor-sette and Edna Grey Hawk (hereafter “Agnes”, “Margaret”, “Rosemary” and “Edna”, individually and/or collectively as “contestants”) and one son, Levi James Snell (hereafter “Levi” or “proponent”). On October 26, 1995, at the age of 87, Lucille executed a will appointing Levi, as her personal representative and primary beneficiary. The will was executed in the Bureau of Indian Affairs (BIA) agency office in Billings, MT. and was witnessed by two BIA employees and notarized by a third BIA employee. Lucille’s attorney, Robert E. LaFountain, Esq. of Billings, MT., had drafted the will and was also present at the signing ceremony. Lucille died on January 8, 1999, at the age of 91
Levi petitioned the Tribal Court to admit Lucille’s will to probate on April 8, 1999. On May 6, 1999, the Tribal Court scheduled a hearing for June 7, 1999. On June 4, 1999, contestants filed a Motion to Continue the matter. This pro se motion made an impassioned plea to the Court to *246 grant sufficient: time to secure legal counsel. It also contained allegations that their brother, the proponent of the will, had used the previous decade to malign their relationship with their mother while “deceiving the law, and forcibly den(ying) (them) communication with (their) mother.” The 'tribal Court proceeded with the June 7th hearing, taking testimony from all of the contestants and the proponent. After taking the testimony, the Tribal Court continued the matter to July 19th.
On July 7, 1999, Levi, through his attorney, filed a Motion to Disqualify Judge Bighorn. In the motion Levi alleged that Judge Bighorn’s father had an argument some years ago with Levi’s father and that the two fathers’ relationship continued to be strained. Levi was concerned that the elder Mr. Big Horn had possibly made reference of the dispute to Judge Bighorn. Additionally, the motion stated that Rosemary’s father was Pete Eagle, who in turn, was Norman Hollow’s uncle and that the Hollows and the Bighorns were related. The motion concludes with, “These facts present an appearance of impropriety and probability of prejudice for Judge Bighorn to preside under these circumstances.”
On July 13th Agnes filed a “Waiver of Filing Fee” claiming that she was unemployed and disabled and therefore without necessary funds to pay for Court transcripts that she apparently wanted to introduce at the hearing.
On July 19th, Leighton Reum, Lay Advocate for the contestants, filed a Motion to Continue the matter due to medical reasons. The court clerk’s log indicates that the motion to continue was granted on July 19th, however, no reference was made regarding the disposition of the Motion to Disqualify Judge Bighorn.
On October 11, 1999, the Tribal Court rescheduled the hearing for November 15, 1999.
On November 15th all of the parties and their legal counsels appeared for the hearing. After the initial statements by counsel it appears that the hearing was transformed into a pre-trial hearing wherein the Court attempted to frame the issues, set forth the discovery period (which was to be completed by December 20th) and then scheduled the matter for trial on January 24, 2000.
Finally, on January 24, 2000, the hearing was held and the matter was taken under submission by the Court. On March 8, 2000, the Tribal Court issued its written order declaring Lucille's will invalid. In addition to finding that Lucille was 91 years old when she died on January 8, 1999, leaving her five children as heirs, the Court also found: 1) Edna had also died subsequent to the initiation of Lucille’s probate action; 2) that Levi had been the sole provider of care of Lucille for the period dating back from 1994 until her death in 1999; 3) that a permanent restraining order, sought by Levi, was issued by the Fort Peck Tribal Court sometime in 1994, restraining the contestants from any contact with Lucille; 4) that as a result of the restraining order the contestants had no significant contact and therefore no significant relationship with the deceased for the period dating back to the issuance of the restraining order, sometime in 1994, until Lucille’s death; 5) that prior to the October 26, 1995 last will of Lucille, there was a previous last will of Lucille which excluded Levi; 6) that Levi testified that more than one attempt was made to revise Lucille’s former will at the Fort Peck Agency in Poplar, MT., but those efforts were unsuccessful and that subsequently he transported Lucille to Billings, MT., with the intent and for the purpose of revising her previous last will; 7) that the October 26th last will devises essentially all property of the estate to Levi with the *247 exception of $5.00, which was to be distributed to the contestants; 8) that “the reasons giving rise to the events of this entire episode, are deeply contentious ... Neither (Levi), nor (contestants) presenting (sp) factual support for the speculations surrounding the care and custody issues relating to (Lucille) ... These events and their causes at this time (are) purely speculation. (sp)”
In that portion of the order generally reserved for the decision, the Tribal Court appears to summarize its factual findings in narrative form in six (6) numbered paragraphs, finally arriving at its ‘bottom line’ conclusion which was to declare Lucille’s last will and testament invalid in paragraph 7. Paragraph 6 reads:
“6. Due to the deeply contentious nature of the relationship that exists between Petitioner and Respondents, now, at the time of the making of the will, and prior to the making of the will, and in light of the occurrence of Petitioner excluding Respondents from the life of the deceased for a period of approximately five (5) years, it is not an extraordinary finding for the Court to conclude that the decedent was subject to undue influence by the Petitioner hereto, at the time The Will was made in October, 1995.”
Levi filed a timely petition for review and a motion to stay Judge Bighorn’s order on March 21, 2000. The petition was accepted for review and the stay was granted by this Court on April 12, 2000.
STANDARD OF REVIEW
We review matters of law de novo, but we will not set aside any factual determinations of the Tribal Court unless such determinations are not supported by substantial evidence. Title II CCOJ 2000 § 202. Factual findings are ‘clearly erroneous’ when it is clear that after a review of the entire record that a mistake has been made. We use the ‘clearly erroneous’ standard in determining whether the Tribal Court was correct in declaring a Will invalid.
ISSUE PRESENTED
Levi presents the following issues for our review:
1. Whether the Tribal Court erred in holding Lucille’s will invalid due to undue influence of Levi on his Mother?
2. Whether the Tribal Court abused its discretion in its failure to require contestants to substantiate their allegations of undue influence.
3. Whether the Tribal Court abused its discretion when the Judge refused to disqualify himself?
We need only to address Levi’s first issue to resolve this matter.
DISCUSSION
Title XII CCOJ 2000 113[1] is the controlling authority on determining the validity *248 of a Last Will and Testament. It states in pertinent part: “... A 'will shall be deemed valid if it was made in writing and signed by the decedent in the presence of two (2) witnesses who then and there signed the will as witnesses, and if, at the time the decedent made the will, the decedent was of sound and sane mind, understood what he/she was doing and was not subject to undue influence or duress of any kind from another person. (Our emphasis.)” If all of the elements of § 113 are present, a presumption arises that the Will is valid.
Evidence in favor of the will: Lucille signed the will in the BIA Agency Office in Billings, MT. Her signature appears to be very shaking and somewhat incomplete. Two BIA employees witnessed the signing and a third BIA employee notarized it. Depositions of one of the witnesses and the notary were taken by Administrative Law Judge William S. Herbert at the Billings Agency office and they were introduced at trial. It is unknown why the second witness’ deposition was not taken and also introduced. Nonetheless, the notary testified in his deposition that he witnessed the two witnesses sign and he further testified that he witnessed Lucille’s signature. Judge Herbert asked the notary if he noticed anything “or have recollection of anything unusual about Lucille at the time of the signing.” The notary answered that he did make entries into his journal that Lucille’s right arm was in a sling and she had difficulty wilting. He also noticed that she could not see out of her left eye. Judge Herbert then continued:
Judge Herbert: In your opinion, was she a person who was competent to sign a will on that date?
Notary: She appeared to be coherent. I asked her if she was willing to sign her name on the will and if she knew that she was making a will and she said yes, she did know she was making a will.
Judge Herbert: Did you have any reason to believe that the will she was signing and her act of doing so was the result of fraud or coercion or undue influence?
Notary: No I did not. If that was so, I probably would not have notarized her will.
(Deposition of Nathel Show, July 30, 1999 @line 8, page 6)
The deposition of Laurelia Martin, one of the witnesses to Lucille’s will, was also introduced. After answering some of Judge Herbert’s basic questions, he asked her about Lucille’s competency:
Judge Herbert: Do you have any reason to believe from your encounter on that day that Lucille Snell had any incompetency in the sense that she was not competent to sign the will?
Laurelia Martin: No.
[[Image here]]
Judge Herbert: Do you have any reason to believe that Lucille’s signing of the will was the product of either fraud or coercion or undue influence against her?
Laurelia Martin: No.
Judge Herbert: Any indication to you that persons were trying to compel her to sign this will and she didn’t want to do so?
Laurelia Martin: No
(Deposition of Laurelia Martin, July 30, 1999 (Aline 21, page 5 & (Aline 10, page 6)
*249 In the preamble to her will, Lucille states that she is of “sound and disposing mind”. In an affidavit accompanying her will, she states:
“... I requested Robert E. LaFountain to prepare a will for me; that the attached was prepared and I requested that Laurelia Martin and Teresa Horse-chief to act as witnesses thereto; that said witnesses heard me publish and declare the same to be my last will and testament; that I signed said will in the presence of both witnesses and they signed the same as witnesses in my presence and in the presence of each other; and that said will was read and explained to me (or read by me), accurately expresses my wishes; and I fux’-ther state that no person has influenced me to make disposition of any part of my property in any other manner than I myself of my own free will desire and wish to dispose of it.”
Lucille’s attorney also signed an affidavit, which accompanies Lucille’s will. Nathel Show, who notarized Lucille’s will, also notarized the affidavit. Mr. LaFountain’s affidavit reads in part:
“... Lulu Lucille Davis Snell ... requested me to prepare her last will and testament; that I prepared the attached will and read (or had read by the interpreter) said will to testatrix and she then stated that said instrument was drawn in accordance with her own wishes as previously stated to me; that said testatrix was not, so far as I could ascertain, acting under duress, menace, fraud or undue influence of any person, and in my opinion was mentally capable of disposing of her estate by will; that she signed the same and published and declared it to be her last will ...”
After reviewing the foregoing evidence, it is clear that the proponent proved that Lucille had signed her will; that her will was signed in the presence of two witnesses; that she, herself, declared that she was of “sound and disposing mind” and three other adult persons appearing with her at the signing ceremony agreed; that at least three adult persons present at the signing felt that Lucille’s act was free of any fraud or duress and that she did not appear to be acting under undue influence from any other person or persons.
Following the presentation of this evidence, our Tribal Court should have accepted the will as meeting the requirements of the statute, subject only to any evidence yet to be presented by the contestants. In other words, the proponent had met the statutory requirements, which deem the will valid, and the burden of proof then shifted to the contestants to prove otherwise.
If evidence is introduced which gives rise to “undue influence” then the burden shifts once again to the proponent.
Undue influence. We have not previously defined ‘undue influence’, nor have we treated the issue in depth.
At the outset, we note the pitfalls in establishing a general definition. As one commentator observed:
“The Courts have always avoided hampering themselves by defining or laying down as a general proposition what shall be held to constitute fraud. Fraud is infinite in variety. The fertility of man’s invention in devising new schemes of fraud is so great, that the courts have always declined to define it, or to define undue influence, which is one of its many varieties, reserving to themselves the liberty to deal with it under whatever form it may present itself.”
KERR, FRAUD AND MISTAKE (7th ed.1.952),
In addition to the problem of the infinite variety of the ways and means to exert *250 ‘undue influence’, we also note the peculiar problem of furnishing a roadmap to future wrongful actors:
“Undue influence has been referred to as a species of constructive fraud which the courts will not undertake to define by any fixed principles lest the very definition itself should furnish a guide to the path by which its consequences may be evaded.” 23 Am.Jur 2d Deeds (Undue Influence) § 203 (1983).
Thus we walk the tight rope of attempting to clearly define a meaningful and instructive guideline that will aid our Tribal Court in determining whether undue influence exists and, in so doing, not pattern a gilded invitation to those who would ‘evade its consequences’.
In our attempt to fashion such a definition, we have reviewed a number of general definitions from other jurisdictions,[2] *251 However, even with a definition to guide them, Courts have had difficulty compiling and then applying criteria to assist in determining when undue influence exists. For example, ‘undue influence’ in Montana is statutorily defined. Section 28-2-407, MCA, provides that undue influence is:
“(1) the use by one in whom a confidence is reposed by another who holds a real or apparent authority over him of such confidence or authority for the purpose of obtaining an unfair advantage over him; (2) taking an unfair advantage of another’s weakness of mind; or (3) taking a grossly oppressive and unfair advantage of another’s necessities or distress.”
In 1965, the Montana Supreme Court set forth five criteria their District Courts could consider regarding a question of undue influence. In re Maricich’s Enlate, 145 Mont. 146, 161, 400 P.2d 873, 881 (1965). The five criteria were to serve somewhat as a practical meter that would assist the District Courts in determining when the statutory definition had been met. The criteria included: (1) any confi *252 dential relationship between the person alleged to be exercising undue influence and the donor; (2) the physical condition of the donor as it may affect his or her ability to withstand influence; (3) the mental condition of the donor as it may affect his or her ability to withstand influence; (4) the unnaturalness of the disposition as it relates to showing an unbalanced mind or a mind easily susceptible to influence; and (5) the demands and importunities as they may affect the donor, taking into account the time, place and surrounding circumstances.
During the next thirty-six years the Montana Courts went from “may consider” the criteria to “must consider” the criteria to ‘all criteria must be present’ and finally returned ‘full eircle’ to the “may consider’ standard. In re Estate of Bradshaw, 305 Mont. 178, 182, 24 P.3d 211, 214 (2001). In Bradshaw, the Montana Supreme Court stated, “The five criteria may, but need not, be present in any given undue influence case. The statutory requirements control. The five criteria are simply nonexclusive considerations available to guide the trial court in its application of the statutory requirements.”
Thus, after reviewing a variety of general definitions and drawing heavily upon the lessons learned from Courts which have struggled for decades with this issue, we hold that undue influence exists when there is a relationship between two people and one of the two is dominant over the other, to the extent that the will and intent of the dominant one displaces the will and intent, and becomes manifest in the action or actions, of the other. Inasmuch as ‘influences’ abound in all family, social and political environments, such ‘influences’ are considered ‘undue’ only when they become manifested in the behavior of the one so influenced without his voluntary endorsement.
To assist our Tribal Court in determining whether the path of evidence leads to undue influence in the context of a will-contest, we offer the following ‘nonexclusive’ criteria:
(1) Was there a confidential relationship between the person or persons alleged to be exercising undue influence and the testator?
(2) Was there a weakened mental or physical condition owing to poor health or advanced age, if such condition was likely to affect the testator’s ability to withstand contrary influences?
(3) Was the Last Will different from and did it revoke a prior Will?
(4) Did the disposition of the dominant one suggest the exercise of such influence?
(5) Did the will disinherit the natural object of the testator’s bounty and favor one of no blood relation?
(6) Did the unnaturalness of the disposition tend to show an unbalanced mind or a mind easily susceptible to influence?
(7) Did the testator seek independent, qualified advice regarding the Will in question?
(8) Did the beneficiary procure the execution of the Will?
(9) Was the testator living in the home of the beneficiary and subject to his/her constant association and supervision?
(10) Did others, close to the testator, have little or no opportunity to see him/ her?
We now apply the facts of this case to the definition and criteria listed above to determine whether the Tribal Court’s order invalidating Lucille’s will was correct.
Evidence of ‘undue influence’.
The central question which was to be answered by the Tribal Court was, “Did Levi so dominant his mother that it was his ‘last will and testament’ that she signed and not *253 her own. The evidence before the Tribal Court showed: 1) A confidential relationship existed between Levi and Lucille; 2) Lucille was advanced in years, suffered some physical disability in her writing arm and according to a transcript from a prior proceeding, may have exhibited early signs of dementia; 3) The will in question revoked a prior will that provided for a disinheritance of Levi; 4) There was no evidence that Levi was predisposed to exercise undue influence over Lucille; 5) The will disinherited Lucille’s daughters, leaving the bulk of the estate to Levi; 6) There was substantial evidence that Lucille was angry with her daughters and that she did not want any contact with them, therefore, disinheriting them could not be said to be ‘unnatural’; 7) Lucille sought and obtained the services of a duly licensed Montana attorney, who signed an affidavit to the effect that he had read the will to Lucille and that she attested that the will accurately reflected her own wishes and that, in his opinion, she was not acting under fraud, duress, or undue influence, and further, that she had the mental capacity to execute the will; 8) Levi testified that he helped Lucille procure the will in Billings after making attempts to do so at the BIA office in Poplar; 9) Lucille was living in Levi’s home and was subject to the constant association of he and his wife, however, no evidence was presented that Levi or his wife actually ‘supervised’ Lucille’s activities; and 10) Due to a ‘permanent restraining order’ sought and obtained jointly by Levi and Lucille, Lucille’s daughters had little or no contact with her for four or five years prior to her death.
At the outset we make an important observation: Whether a ‘laundry list’ of criteria exists or not, it is critical that our Tribal Court enumerate the evidence which supports it’s holding. It is not enough to show that an opportunity to influence, or a motive to influence existed. At best these elements simply set the stage for potential undue influence. Thus, a confidential relationship between the two people, the procurement of, and the profiting from, the will by the alleged wrongdoer, may all be steps leading to the doorway of undue influence, however, they alone cannot sustain such a finding. There must be evidence of the actual exercise of undue influence. We recognize that most often it is extremely difficult to show an exercise of undue influence with direct evidence; therefore, we hold that circumstantial, as well as direct evidence, may be used.
In the instant case, the Tribal Court either had no evidence of actual undue influence, or, it simply made no attempt to enumerate such evidence in its findings, stating that the matter was “highly contentious”; that neither of the parties supported their respective arguments; and then further citing the fact that Levi had excluded his sisters from communicating with their Mother. Thus, it is apparent that the Tribal Court took what it perceived as “fertile or suspicious circumstances”, and without any actual evidentia-ry support, extrapolated a finding of undue influence. Therefore, the Tribal Court order invalidating Lucille’s will is not supported by substantial evidence. § 202.
However, in our opinion this matter is not completely resolved by a reversal with instructions to admit the will to probate. Because the contestants failed to file a formal pleading in the first instance, adequate notice was not given to the proponent of the will as to the contestants’ allegations. The lack of pleadings resulted in inadequate discovery prior to trial. These inadequacies were further complicated by the allegations by the proponent giving rise to his Motion to Disqualify Judge Bighorn. When taken all together, we are not convinced that any of the liti *254 gants in this matter received a fair trial. Accordingly,
IT IS NOW THEREFOR THE ORDER OF THIS COURT THAT:
1. The Order Declaring Last Will and Testament Invalid issued on March 8, 2000 by the Tribal Court is vacated with instructions to the Tribal Court to issue a new Order admitting Lucille Lulu Snell’s Last Will and Testament to probate.
2. The contestants herein shall have 30 days from the date of entry of the Tribal Court’s order admitting Lucille’s will to probate, to file allegations, if any they have, in the form of a complaint contesting said will. If filed, said complaint shall contain sufficiently specific allegations of undue influence to comport with the definition set forth herein.
3. The Tribal Court, in its discretion, may award attorney’s fees and costs to the prevailing party of any future will contest involving the parties herein.
CONCUR: GERARD M. SCHUSTER, Associate Justice.

. Title XII CCOJ 2000 113. Wills: When anv Indian dies, leaving a will disposing of property subject to the jurisdiction oí the Court, the Court, at the request of any person named in the will or any other interested party, shall determine the validity of the will after giving notice as provided by Section 104 hereof. A will shall be deemed valid if it was made in writing and signed by the decedent in the presence of two (2) witnesses who then and there signed the will as witnesses, and if, at the time the decedent made the will, the decedent was of sound and sane mind, understood what he/she was doing and was not subject to undue influence or duress of any kind from another person. If the will is determined to be invalid, the Court shall determine the heirs as if the decedent had died without a will, and shall distribute the property accordingly; provided that the determination that a will is *248 invalid shall be a final order which may immediately be appealed as provided in Title II, Chapter 2, Section 205 of this Code.

. We catalog several of the definitions here for illustrative purposes only. Some ot the definitions that follow are not in the context of a ‘will contest’.
Definition of 'undue influence' contained in jury instruction in Alaska case:
"A maker of a will is unduly influenced when another person has so influenced the maker that the maker made a will which she would not have made had she freely followed her own judgment and wishes. For the challenger to win on this claim, you must decide that it is more likely than not there was undue influence.” Matter of Estate of McCoy, 844 P.2d 1131, 1133 (Alaska 1993).
Georgia law defines undue influence as "the exercise of sufficient control over the person, the validity of whose act is brought in question, to destroy his free agency and constrain him to do what he would not have done if such control had not been exercised." Burroughs v. Reed, 150 Ga. 724, 105 S.E. 290 (1920). To be "undue,” and thus render the transaction void, the influence exerted must be such to deprive a party "of his free agency by substituting for his will that of another." Scurry v. Cook, 206 Ga. 876, 878, 59 S.E.2d 371 (1950).
Illinois: Undue influence has been defined as "any improper urgency of persuasion whereby the will of a person is overpowered and he is induced to do or forbear an act which he would not do or would do if left to act freely.” Powell v. Bechtel, 340 Ill.. 330, 338, 172 N.E. 765, 768 (1930).
In Kansas: “The test of undue influence is whether the party exercised his own free agency and acted voluntarily by the use of his own reason and judgment, which may be determined from all the surrounding circumstances, including the relation of the parties, the time and manner of making suggestions or giving advice, the motive, if any, in making suggestions, and the effect upon the party so acting.” Cersovsky v. Cersovsky, 201 Kan. 463, 467, 441 P.2d 829 (1968): Logan v. Logan, 23 Kan.App.2d 920, 937 P.2d 967, 972 (1997).
Massachusetts: Undue influence is defined as "whatever destroys free agency and constrains the person whose act is under review to do that which is contrary to his own untrammeled desire.” Bruno v. Bruno, 10 Mass.App.Ct. 918, 411 N.E.2d 1324 (1980)
Missouri: "Undue influence itself is usually defined as such over-persuasion, coercion, force, or deception as breaks the will power of the testator or grantor and puts in its stead the will of another.” Hamilton v. Steiniger, 350 Mo. 698, 168 S.W.2d 59, 67 (1943). It is necessary that the undue influence be operative at the time of execution of the deed sought to be set aside. Wilkie v. Elmore, 395 S.W.2d 168, 173 (1965). It is not "undue influence” for a defendant to exercise influence so long as it was not so coercive or importunate as to deprive the plaintiff of her free agency. Id.
In Montana, undue influence is defined by statute. Section 28-2-407, MCA, provides that undue influence is: (1) the use by one in whom a confidence is reposed by another who holds a real or apparent authority over him of such confidence or authority for the purpose of obtaining an unfair advantage over him; (2) taking an unfair advantage of another's weakness of mind; or (3) taking a grossly oppressive and unfair advantage of another's necessities or distress.
North Carolina: Undue influence is defined as “the exercise of an improper influence over the mind and will of another to such an extent that his professed act is not, that of a free agent, but in reality is the act of the third person who procured the result.” Lee v. Ledbetter, 229 N.C. 330, 332, 49 S.E.2d 634, 636 (1948).
*251 Ohio: Undue influence has been defined as "any improper or wrongful constraint, machination, or urgency of persuasion whereby the will of a person is overpowered and he is induced to do or forbear an act which he would not do or would do if left to act freely.” Marich v. Knox Cty. Dept. of Human Serv. (1989), 45 Ohio St.3d 163, 543 N.E.2d 776, quoting Black’s Law Dictionary (5 Ed. 1979) 1370. It has also been described as a form of influence that would destroy the free agency of the mind and cause people to act against their will. Raymond v. Hearon (1928), 30 Ohio App. 184, 164 N.E. 644; Rich v. Quinn (1983), 13 Ohio App.3d 102, 13 OBR 119, 468 N.E.2d 365.
Pursuant to New' York law, undue influence is defined as “a moral coercion, which restrained independent action and destroyed free agency, or which, by importunity which could not be resisted, constrained the testator to do that which was against his free will.” Children's Aid Soc. of N.Y. v. Loveridge, 70 N.Y. 387, 394 (1877), “A mere showing of opportunity and even of a motive to exercise undue influence does not justify a submission of that issue to the jury', unless there is in addition, evidence that such influence was actually utilized.” Matter of Walther, 6 N.Y.2d 49, 55, 188 N.Y.S.2d 168, 173, 159 N.E.2d 665 (1959).
North Dakota: “In cases involving will contests, we have defined undue influence as the substitution of the purpose and intent of the one exercising influence for the purpose and intern of the testator. Matter of Estate of Herr, 460 N.W.2d 699, 702 (N.D.1990). This Court has stated that undue influence is characterized by four elements: the testator is subject to such influence; the opportunity to exercise undue influence existed; there was a disposition to exercise such influence; and the result appears to be the effect of such influence. Matter of Estate of Mickelson, 477 N.W.2d 247, 250 (N.D.1991). Undue’ influence is seldom exercised openly; because direct evidence is rarely available, undue influence may be proven by circumstantial evidence.” See Estate of Davis v. Cook, 9 S.W.3d 288, 293 (Tex.App.1999); Matter of Estate of Bayer, 574 N.W.2d 667, 671 (Iowa 1998); Redman v. Watch Tower Bible and Tract Soc. of Pennsylvania, 69 Ohio St.3d 98, 630 N.E.2d 676, 679 (Ohio 1994); In re Estate of Larson, 394 N.W.2d 617, 620 (Minn.Ct.App.1986).
Rhode Island; “Undue influence” is defined as the “substitution of the will of (the dominant] party for the free will and choice [of the subservient party]." Caranci v. Howard, 708 A.2d 1321, 1324 (R.1.1998).
Tennessee: "Undue influence has been defined as that influence which controls the mental operations of the one influenced by overcoming his power of resistance and thus obliging hint to adopt the will of another, thereby producing a disposition of property or the performance of some act by the influenced person which he otherwise would not have done.” Scott v. Pulley, 705 S.W.2d 666, 669 (Tenn.App. 1985)
Undue influence in a contract context: "Undue influence” has been defined as “unfair persuasion of a party who is under the domination of the person exercising the persuasion or who by virtue of the relation between them is justified in assuming that that person will not act in a manner inconsistent with his welfare.” Restatement (Second) of Contracts 177(1) (1981).